[Civ. No. 17809.    Second Dist., Div. Three.    July 24, 1951.]

BARRY M. YORK et al., Respondents, v. M. T. STROMMEN, Appellant.

A. G. Van Deventer for Appellant.

Kaplan, Livingston, Goodwin & Berkowitz and Monte E. Livingston for Respondents.

WOOD (Parker), J.—Action for damages for breach of written contract. Defendant Strommen filed a cross-complaint for reformation of the contract. Judgment was as follows: That, upon the complaint, the plaintiffs recover from defendant Strommen $49,916.36 and $1,500 as attorney's fees; and that the cross-complaint is dismissed. (The action was dismissed without prejudice as to defendant Barker, who was out of the state.) Defendant appeals.

It was alleged in the complaint that plaintiffs are the owners of certain lipstick applicator inventions, some of which are described and claimed in patent application Serial No. D-131,-033 heretofore filed in the United States Patent Office; on April 25, 1947, plaintiffs entered into a written agreement with defendants Strommen and Barker whereby plaintiffs granted to defendants the exclusive right to manufacture and sell said applicator inventions throughout the United States

for five years after the date of the agreement, and it was provided in said agreement that defendants agreed to use due diligence in promoting the sale of said applicators, and they further agreed to sell, during the first two years, a minimum amount of 2,000,000 applicators and to pay plaintiffs 2½ cents for each of said applicators sold by defendants; that defendants failed to use due diligence in promoting the sale of the applicators and failed to sell 2,000,000 applicators in accordance with the terms of the contract or at all, except 3,346 for which defendants paid $83.64; that plaintiffs have performed the terms of the contract on their part to be performed; and that as an approximate result of the failure of defendants to perform the terms of the contract, plaintiffs were damaged in the sum of $49,916.36.

In the answer of defendant Strommen it was alleged that said inventions are not owned by the plaintiffs and are not patented; that said agreement, "as same was executed by the parties," was erroneous, mistakenly and imperfectly drawn, in that, prior to its execution all parties agreed that the only detriment or penalty which should be suffered by the licensees, in the event they should not be able to sell the agreed minimum number of 2,000,000 applicators during the first two years, would be the loss of the purported exclusive license and all drawings, blueprints, dies and special tools used by licensees in the production of the applicators, which said articles should become the property of the licensees upon such failure; that said defendant was informed by plaintiffs at the time of executing the agreement that the agreement "did so provide"; that said defendant did not have advice of counsel, did not then read the agreement, and until this action was filed "and served upon" said defendant he had never concerned himself in reading the agreement; he would not have executed the said agreement had he known that "same did not so provide"; that since summons was served upon him he has learned for the first time of such mistake and imperfection in the agreement; that in a cross-complaint he will seek to have the agreement reformed to provide for the release of the licensees (defendants) in the manner above stated in the event of failure to sell the minimum number of applicators; that said defendant has paid to plaintiffs all sums due to them; and that plaintiffs were not damaged in any sum.

Defendant Strommen alleged, in his cross-complaint, that cross-defendants claimed to be the owners of certain lipstick applicator inventions; that shortly prior to April 25, 1947,

cross-defendants, cross-complainant and one Barker held many discussions and negotiated for the exclusive rights to be granted by cross-defendants to cross-complainant and Barker to manufacture and distribute said inventions; that said parties verbally agreed that cross-defendants should grant a license to cross-complainant and Barker to manufacture and distribute the applicators for a period of five years after April 25, 1947, upon the condition that licensees should pay to licensor 2½ cents for each applicator sold by licensees; that licensees should expend certain vast sums in producing and advertising said product, and licensees should agree to sell 2,000,000 applicators during first two years of said term and an average of 1,000,000 per year during said five years; that it was agreed that in the event licensees should be unable to sell "said agreed numbers of such products in said times," licensors should have the right to cancel the rights of licensees under such license and that, upon such cancellation, licensors should become the owners of all drawings, blueprints, dies, and special tools used by licensees in the production of said applicators, and licensees should in no event assume any liability beyond the loss of said articles, except the duty to pay said 2½ cent royalty "or such of said lipstick applicators as Licensees did in fact sell"; that said parties agreed that the terms of their said agreement should be reduced to writing and signed by them; that a writing was then prepared and submitted to cross-complainant for signature; that the cross-complainant asked cross-defendants if said writing was in all respects in line with the preliminary oral agreements, and they were assured by cross-defendants that said writing was in all respects in line with such agreements; cross-complainant believed such statements of cross-defendants and relying upon such statements "signed the same"; said writing, as prepared and signed by all parties, contained a mistake or imperfection, in that, it did not provide that licensees' liability should be limited, in the event of their inability to sell the agreed minimum quantities of applicators, to the loss of said drawings, blueprints, dies and special tools and to the loss of their rights to such territorial exclusive distribution; that cross-complainant first learned that said written agreement contained such mistake or imperfection on May 3, 1949, when he was served with summons in this action; and that said written agreement does not truly reflect the intent of the parties and should be reformed by adding the provisions which were erroneously omitted.

The court made findings to the effect that the allegations of the complaint were true, including a finding that in said written agreement the defendants agreed to sell during the first two years a guaranteed minimum of 2,000,000 applicators, and agreed to pay to plaintiffs therefor 2½ cents each or a minimum guaranteed sum of $50,000 on or before the expiration of the two-year period.

On April 25, 1947, plaintiffs York and Schnack, as licensors, and the defendants Strommen and Barker, as licensees, entered into a written agreement,[1] which is set forth in part in the margin hereof.

---

[1] "WHEREAS, LICENSORS are the owners of certain lipstick applicator inventions described and claimed in patent application Serial No. D-131,033 heretofore filed in the United States Patent Office, and in an additional patent application . . . which said application has been signed and is about to be mailed to the Patent Office, and

"WHEREAS, LICENSEES represent that they have the facilities for manufacturing and nationally distributing said inventions and are desirous of obtaining the exclusive right and license so to do,

"Now, THEREFORE, in consideration of the foregoing and of the covenants and conditions hereinafter recited, the parties hereto agree as follows:

"1. License:

"Subject to the due performance of this agreement by LICENSEES, the LICENSORS hereby give and grant unto LICENSEES the exclusive right under all patents issuing on said inventions, to manufacture and sell lipstick applicators embodying said inventions, hereinafter referred to as 'said applicators,' throughout the United States of America, its territories and possessions, for a period of five (5) years from and after the date of this agreement and subject to the provisions for renewal hereinafter set forth.

"2. Royalties:

"LICENSEES agree to pay to LICENSORS the sum of two and one-half (2-½¢) cents for each of said applicators sold by LICENSEES hereunder, and to pay to LICENSORS the sum of one (1¢) cent on in each tablet or cake of lipstick sold as a re-fill for said applicators. An item shall be considered sold when it has been invoiced by LICENSEES.

"3. Performance:

"LICENSEES agree that within six (6) months from the date of this agreement they will be tooled up and in commercial production of said applicators ready to supply the market therefor, will have placed a reasonable amount of national advertising which shall have been published by said date, and will have paid out for said tooling and advertising not less than Ten Thousand ($10,000.00) Dollars as direct charges therefor.

"LICENSEES further agree to use due diligence and their best efforts in promoting the sale of said applicators throughout the territory licensed hereunder and in supplying the market therefor, and agree that during the first two (2) years of this contract they will sell two million (2,000,000) of said applicators, and during said five (5) year term their said sales will average one million (1,000,000) per year.

"4. Payments and Reports:

"Royalties shall be paid quarterly to LICENSORS on or before the Fif-

Also, on said April 25, 1947, at the time of signing said writing, the said parties executed a supplement[2] to said paragraph 14, which is set forth in part in the margin.

■ Appellant (defendant Strommen) contends that the evidence was insufficient to support the finding that plaintiffs fully performed all the terms and conditions of said agreement on their part to be performed. He argues that under the pleadings there was a material issue as to whether there had been performance on the part of plaintiff, especially with reference to obtaining letters patent. There was no evidence that letters patent had been issued. As above stated, it was al-

---

teenth (15th) day of the month following the close of the preceding calendar quarter. Each royalty payment shall be accompanied by a report prepared by a certified public accountant showing in detail the number of said applicators and re-fills sold during the preceding quarter and the amount of royalty due thereon.

"5. Books and Inspection:

"LICENSEES agree to keep accurate and complete books and records showing in detail the quantities of said applicators and re-fills manufactured and sold by them, . . . .

"6. Improvements:

"It is agreed that all improvements, modifications, and substitutions of said inventions, hereinafter referred to as 'improvements,' made or acquired by any of the parties hereto shall be and become the property of LICENSORS subject to all of the terms and conditions of this agreement, and shall be included in the term 'said inventions' whenever used herein. All patents issuing on said improvements shall be included in the term 'said patents' as used herein. . . .

"7. Marking:

"LICENSEES agree to place upon each and every one of said applicators made or sold by them hereunder the statutory patent notice incorporating data as specified by LICENSORS.

"8. Patent Information:

"LICENSORS agree to supply LICENSEES with true copies of all patent applications filed by them on said inventions and all patents issuing thereon.

"9. Disability of Licensees:

"If LICENSEES shall be declared bankrupt or insolvent, . . . such act or event shall be considered a breach of this agreement.

"10. Foreign Patents: . . . .

"11. Termination:

"If either party hereto shall breach any of the terms of this agreement and shall not cure such breach within sixty (60) days after written notice thereof, then the aggrieved party may, by written notice, termi-

---

2"Supplementing paragraph fourteen (14) of the agreement by and between the following: Barry M. York . . . Van Nuys, California, Carl H. Schnack . . . Los Angeles, and M. T. Strommen of Arcadia, California and H. Lawrence Barker of New York dated April 25, 1947. In the event that the LICENSORS should terminate the agreement with the LICENSEES, if they wish to continue to use the name *Originelle-Trulip* after such termination of the agreement, they are to pay a royalty to the LICENSEES."

leged in the complaint that plaintiffs are the owners of certain lipstick inventions, some of which are described and claimed in a certain patent application. The court found that said allegation was true, that is, that plaintiffs were owners of inventions described and claimed in an application. It did not find that letters patent had been issued. The representations of plaintiffs in the agreement were also to the effect that plaintiffs were owners of certain inventions described and claimed in a certain patent application filed in the patent office, and in an additional patent application about to be mailed to that office. It was not recited in the agreement that letters patent had been issued. Under the circumstances here it was not necessary for plaintiffs (licensors) to prove they were owners of letters patent. The defendant (licensee) did not plead, prove, or offer to prove, that the exclusive license granted to him by plaintiffs was revoked, impaired, or interfered with, or that there was anything in the nature of an eviction with respect to his right to manufacture and sell the applicator. In *Wyman* v. *Monolith Portland C. Co.*, 3 Cal.App.2d 540 [39 P.2d 510], the plaintiffs sought to recover royalties for the use of a process in making cement; and it was alleged in the complaint that on a certain date the plaintiffs and one

---

nate this agreement forthwith; provided, however, that LICENSEES may sell all of said applicators as they may have on hand or on order upon the date of such termination. Termination of this agreement shall not relieve LICENSEES from paying the full royalties herein provided on all of said applicators sold by them either before or after the date of such termination. Failure by either party to terminate for any breach of the other party shall not be construed as a waiver of the right so to do for any continuation of said breach or for any subsequent breach of the same or *dis*similar nature. ·

"Upon any termination of this agreement all drawings, blueprints, dies, jigs, templates and special tools used by LICENSEES or either of them in the production of said applicators shall be and become the property of LICENSORS and shall be delivered to them promptly by LICENSEES.

"12. Attorneys' Fees:

"It is mutually agreed that in any litigation between the parties hereto involving this agreement or any monies payable hereunder, the court may award to the succesful party in such litigation as and for attorneys' fees such sum as the court may deem reasonable, and such award shall become a part of the judgment in said suit.

"13. Renewal:

"LICENSORS agree if the LICENSEES shall not be in default in any of the terms of this agreement upon the expiration of its term LICENSEES may renew this agreement for additional five (5) year periods under the same terms and conditions as herein set forth. . . .

"14. Succession:

"This agreement shall inure to the benefit of and be binding upon the heirs, successors and assigns of LICENSORS, but may not be assigned in whole or in part by LICENSEES without the written consent of LICENSORS."

Olson were owners of the right to manufacture and sell cement under certain letters patent issued to Olson. The defendant therein contended that even if it be assumed that plaintiffs were the owners of such right on the date alleged in the complaint, there was no allegation that they were owners of such right at the time the royalties accrued or at the time the complaint was filed. The court therein said at page 543: "[I]t clearly appears from the evidence that the right of appellant [defendant], the cement company, to manufacture and sell the patented product was never revoked nor interfered with, and until appellant can show 'something in the nature of an eviction' no cause of action arises. The allegations in the complaint, therefore, were superfluous, and whether or not it alleges ownership in respondents [plaintiffs] at the time of the filing of the complaint, was immaterial. It was not necessary for plaintiffs to either plead or prove their title, and appellant is estopped from denying plaintiffs' title unless it pleads and proves that it has failed to receive that for which it contracted. . . . The following cases support the contention of respondents that in an action to recover royalties under a license defendant cannot defend by denying the title of plaintiff 'without pleading and proving something in the nature of an eviction,' as was said in . . . [Citations]." It does not appear that plaintiffs failed to perform any of the terms or conditions on their part to be performed.

Appellant also contends that the evidence was insufficient to support the finding to the effect that defendants (licensees) agreed to pay plaintiffs a minimum of $50,000 for the two-year period. He argues to the effect that the agreement is ambiguous, in that, the provisions of paragraphs 2 and 3 thereof are contradictory. Paragraph 2 states in substance that the licensees agree to pay to licensors 2½ cents for each applicator sold, and an item should be considered sold when it is invoiced by licensees. Paragraph 3 states in substance that the licensees agree that during the first two years of the contract they will sell 2,000,000 of the applicators, and during the five-year term of the agreement their sales will average 1,000,000 per year.

Respondents (plaintiffs) argue that paragraphs 2 and 3 are not inconsistent, that each covers a subject matter of a separate and distinct nature—that paragraph 2 establishes the contract rate of payment per item and a definition of the items to which such rate shall apply, namely, the licensees agree to pay 2½ cents for each applicator sold and invoiced,

as distinguished from items manufactured or delivered; that paragraph 3 establishes the obligation undertaken by the licensees to sell a guaranteed amount of 2,000,000 applicators during the first two years of the license period. They argue further in effect that the fact that licensees agree to pay a certain amount for an article sold does not conflict with the obligation to sell a specified minimum number of articles.

Appellant argues further that all discussions had prior to the making of the agreement were to the effect that no minimum guarantee was to be made insofar as a guaranteed payment of money was concerned and that in the event the minimum number of sales could not be made the appellant would lose his franchise and dies and the money he had invested therein. Defendant Strommen testified that he did not intend unqualifiedly to pay $25,000 per year irrespective of whether he sold any applicators, that the "only thing I agreed to pay was 2½ cents royalty on each case sold, and if I didn't live up to my contract, my contract was to terminate and I would lose the money and the equipment that I had made up"; that plaintiffs "agreed to that in my office before they even took their notes up to their lawyer." (The notes referred to were memoranda regarding the proposed transaction.) Plaintiff Schnack testified that he was present in the office of Mr. Fulwider, plaintiffs' patent attorney, when the plaintiffs and defendants and Mr. Fulwider were discussing the proposed agreement which was to be prepared by Mr. Fulwider; that defendant Barker suggested different things about the amount that would be sold over a period of two years "because Mr. York [one of plaintiffs] wanted cash, he wanted cash so that we—of course I had a lot of time in it and I also had some cash of my own and we thought it would be equitable if we had that cash out and let them operate as they wanted. But they didn't agree to that because they wanted to run over a period of two years before we received anything, but we were to have a report, a quarterly report. So Mr. Fulwider sat back and suggested this and Mr. Barker said no, and Mr. Fulwider said, 'Well, will this be all right,' and Mr. Barker and Mr. Strommen said 'Yes, that will be all right.' That is the way the contract was written up. Q. What, if anything, do you recall about this minimum guarantee of two million to be sold in the first two years? What discussion was had about that particular phase of the contract? A. Well, we wanted at least 5 or 6 per cent and they would not agree to that because they thought it would reach pretty high and

all this and that sort of thing, that the production cost would run up too high. So then I said, 'We will make it a straight figure.' They said, 'Well, 5 cents, because if you sold it for a dollar and one-half why the royalty would reach 12½ cents.' So I said the only fair way to do that then is to make it a straight rate, make it 2½ cents apiece, and Mr. Fulwider said, 'Well, is that agreeable with you gentlemen,' and they said, 'Yes, that is agreeable with us.' Q. And it was agreed, was it, that two million were to be sold in the first two years? A. That is right. Q. So that it was your understanding in the conversation that you were to receive $25,000 a year for the first two years? A. That was my understanding.''

Mr. Fulwider testified, regarding the conversation preliminary to the preparation of the agreement, as follows: ''There was a lot of discussion about what the licensees would sell, they would sell so many each year and they would do this and they would do that, they would pay royalties, and they would sell them. That much I am sure of. Now, then, what the particular words were, whether somebody raised a point and said, 'Now, if we don't sell them do we have to pay royalties on the difference,' I don't know. But I wrote the agreement on that assumption and my notes bear me out. Q. You wrote the agreement on what assumption? A. On the assumption that there was a firm commitment there to sell one million of these things a year and pay a royalty, and if they didn't sell them they still had to pay a royalty. Q. As a patent attorney, then, you are testifying in this case, Mr. Fulwider, that in your practice that you at that time believed that Mr. Strommen and Mr. Barker intended to pay $25,000 a year if they never even sold any, is that what we are to understand you as testifying to? A. That is correct.'' He also testified as follows: ''Q. Mr. Fulwider, you have testified that it was your impression from something that you must have seen or heard that day that Mr. Strommen and Mr. Barker intended by signing this agreement which you prepared that they should be penalized the sum of $25,000 even if they didn't sell any of these things, is that your statement? A. Yes. Q. Now, you base that opinion or that impression upon what? A. On the notes I made and the contract I drew and my recollection of the general discussions. I wouldn't have written it down there if it hadn't been said.'' He also testified: ''Q. Mr. Barker then told you very glibly that he expected to sell millions of them, is that correct? A. That is right. Q. Now, did you pin him down as to this minimum? Did you reduce that or inter-

pret that in money, or did you always speak of it in terms of 2000 [2,000,000] lipstick applicators? A. Well, I was thinking along the line—I was translating it in my own mind to dollars. I can say positively it was transferred into dollars in our discussions."

Plaintiff York testified that he was present in Mr. Fulwider's office when plaintiffs and defendants and Mr. Fulwider discussed the proposed agreement; that Mr. Fulwider made notes of the conversation; that plaintiffs demanded a cash consideration payable on execution of the agreement but defendants did not agree to that. "Q. Was there any discussion about the fact at the end of two years that two million were to be sold during the first two years? Was that agreed to? A. Yes, it was because Mr. Barker said it would be very easy to sell after they got rolling five million instead of a million." He also testified that it was always his understanding that at the end of two years plaintiffs were to receive a minimum of $50,000.

Plaintiff Strommen testified that he was not in Mr. Fulwider's office prior to the time the contract was prepared; that he was in Mr. Fulwider's office only once and at that time the agreement had already been typed; that he could not read the contract at Mr. Fulwider's office because he did not have his glasses; the contract was read to him in that office; each party was given a copy of the proposed agreement and then they returned to defendant Strommen's office; he (Strommen) did not read the contract then but he listened while defendant Barker read it; they discussed the contract and it was signed in his office; he signed the contract without reading it. He received a copy of the contract after it was signed by all the parties.

Plaintiff York testified further that after the parties had returned to defendant Strommen's office with copies of the proposed agreement, the agreement was read aloud by defendant Barker; that after the contract had been read defendant Barker dictated a supplement to paragraph 14 of the agreement, and the supplement was also signed by the parties at that time. The said supplement is hereinabove referred to.

It does not appear that the agreement was ambiguous. The defendants agreed to pay a royalty of 2½ cents for each applicator sold, and they agreed to sell 2,000,000 applicators during the first two years. Even if the agreement should be regarded as ambiguous, the trial court resolved the conflicts in the testimony, regarding the intent and understanding

of the parties, in favor of plaintiffs. The evidence was sufficient to support the finding to the effect that defendants agreed to pay plaintiffs a minimum of $50,000 for the two-year period.

Appellant contends also in effect that paragraph 11 of the agreement provided the exclusive remedy of plaintiffs in the event of a breach of the agreement by defendants. That paragraph provides that if either party shall breach any of the terms of the agreement and shall not cure such breach within 60 days after written notice thereof, then the aggrieved party may terminate the agreement; that termination of the agreement shall not relieve the licensees from paying full royalties on all applicators sold; and that upon any termination of the agreement all drawings, blueprints, dies and special tools used by licensees shall become the property of the licensors. The termination of the agreement was an additional remedy afforded either party in the event of a breach of the agreement by the other party and is not inconsistent with a right to seek damages for a breach of the agreement.

By reason of the above conclusions, it is not necessary to discuss other contentions of appellant.

Appellant has made an application for permission to produce additional evidence in this court. The additional evidence consists of photostatic copies of the two Patent Office "file wrappers and contents," which wrappers and contents, according to appellant's affidavit, "trace two applications for Letters Patent from time of filing until rejection." By the additional evidence, appellant asserts that he seeks to prove that plaintiffs were not the owners of the lipstick applicator inventions. As above stated, it was not necessary for plaintiffs to prove that they were owners of letters patent. The application to produce additional evidence should be denied.

The application to produce additional evidence in this court is denied. The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied August 14, 1951, and appellant's petition for a hearing by the Supreme Court was denied September 20, 1951.