**PAINTON & COMPANY, Ltd., Plaintiff-Appellee-Cross-Appellant,**

v.

**BOURNS, INC., Defendant-Appellant-Cross-Appellee.**

**Nos. 425, 729, Dockets 34959, 71–1089.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1971.

Decided April 27, 1971.

C. Dickerman Williams, New York City (Baker, Nelson, Williams & Mitchell, New York City, and John P. Dellera, New York City, of counsel), for plaintiff-appellee.

Clyde F. Willian, Chicago, Ill. (Hume, Clement, Hume & Lee, Ltd., Roy E. Hofer and Robert L. Harmon, Chicago, Ill., William C. Conner, Curtis, Morris & Safford, New York City, of counsel), for defendant-appellant.

Roger M. Milgrim, New York City (Milgrim, Thomajan & Jacobs, New York City, of counsel), submitted brief as amicus curiae.

Edward Halle, New York City, for the New York Patent Law Assn., New York

City (Robert S. Dunham, Bert A. Collison, Pauline Newman and Robert J. Sanders, Jr., New York City, of counsel), submitted brief as amicus curiae.

Before WATERMAN and FRIENDLY, Circuit Judges, and McLEAN, District Judge.[*]

FRIENDLY, Circuit Judge:

Painton & Company, Ltd., plaintiff in this action in the District Court for the Southern District of New York, in which federal jurisdiction was based on diverse citizenship, 28 U.S.C. § 1332(a) (2), is a British corporation engaged in the manufacture and sale of electronic components. Defendant Bourns, Inc., a California corporation, having its principal place of business in that state but doing business in New York, is likewise so engaged. The controversy concerns Painton's continued right to use information, relating to electronic circuit components known as potentiometers, which was supplied by Bourns under an agreement that has expired.

### I.

Painton had developed and had been manufacturing and selling a lead screw actuated linear motion potentiometer known as Flatpot. Bourns had been developing, manufacturing, and selling more technologically advanced potentiometers, including one known as Trimpot. In August 1958 the two companies entered into an agreement whereby Bourns contracted to furnish Painton, on a confidential basis, engineering and manufacturing services and techniques necessary to enable Painton to manufacture lead screw actuated linear motion potentiometers. The agreement was to continue for a term of eight years and thereafter until either party, on six months notice, elected to terminate or modify it. Painton was to pay fees on all products covered by the agreement, which excluded Flatpot, on a scale descending from 5% of the net selling prices in the first year to 2½% in the

sixth and thereafter. If these were insufficient to accrue fees of $5,000 in any two-year period, Bourns could cancel the agreement on 60 days notice. There was no provision for post-termination payments by Painton, other than for those which were "due and payable or becoming due prior to the date of such termination," and the agreement was silent with respect to its post-termination rights to use the information supplied thereunder.

In 1960 the earlier agreement was superseded by another which included, in addition, worm gear potentiometers. As in the 1958 agreement, the term was for eight years and thereafter until either party, on six months notice, elected to terminate or modify. The fee was to be 3½% of the net selling prices except that on Flatpot there was a sliding scale ranging downward from 4% in the first year to 2½% in the fourth and thereafter. There was the same clause as to termination for failure to accrue minimum fees of $5,000 in any two-year period. Again there was no provision for post-termination payments by Painton, other than for those specified in the 1958 agreement; and again the agreement was silent with respect to its post-termination rights. Under both agreements Painton had an exclusive right to manufacture and sell the covered products in certain areas— Western Europe and Australia in the 1958 agreement, all of Europe, Australasia and Africa in the 1960 agreement. There were many other provisions, but this summary is sufficient for present purposes.

On March 25, 1962, Bourns sent a letter purportedly terminating the agreement as revised in 1960 for failure by Painton to make payments—within the time required—for materials, supplies, and completed units sent to it by Bourns. Painton retained American counsel who challenged the validity of Bourns' action and subsequently brought suit in a related matter to enjoin Bourns from selling, marketing, or distributing its products

---

[*] Of the District Court for the Southern District of New York, sitting by designation.

in Europe, Australasia, and Africa in violation of the 1960 agreement. There ensued an extensive exchange of correspondence and meetings looking toward the execution of a new agreement more satisfactory to Bourns. The negotiations, which we shall later discuss in detail, culminated in a new agreement dated November 1, 1962. Its provisions important to the present controversy were as follows:

a) *Paragraphs 1 and 2.* All previous agreements, save several separate sales agreements not here relevant, were canceled and all claims under them were released except for amounts owing to Bourns from fees or from the sale of products, parts, or materials.

b) *Paragraph 3.* The products subject to the agreement were "[a]ll models heretofore, or hereafter during the term of this Agreement" manufactured by Bourns of worm gear or lead screw actuated potentiometers; the Flatpot and modifications thereof; and other devices manufactured by Bourns as might be mutually agreed.

c) *Paragraph 4,* entitled "License Granted," read in pertinent part as follows:

Bourns hereby agrees to furnish to Painton during the term hereof, engineering and manufacturing services and techniques, which include specifications, drawings, equipment designs and circuitry, cost breakdowns, operations descriptions, and other information necessary to enable Painton to manufacture Bourns' products covered by this Agreement. Information shall be provided by Bourns on models not now manufactured by Painton to a maximum of 2 models per year for the term of this Agreement, such models to be selected by Painton.

Bourns grants to Painton the exclusive right and license to use such information in the geographical area defined in this Agreement. Bourns shall provide complete drawings and specifications for the products covered by this Agreement. Additional information pertaining to design, know-how and manufacturing techniques shall be made available at Bourns' plant at 1200 Columbia Avenue, Riverside, California, to authorized personnel of Painton at all reasonable times.

d) *Paragraph 5.* With the exception of non-wire-wound elements, improvements made by either party were to be available to the other. "No change in the design of Bourns' products covered hereby may be made by Painton without written consent of Bourns."

e) *Paragraph 6,* entitled "Term of Agreement," read as follows:

Unless otherwise terminated as herein provided, this Agreement shall terminate at midnight October 24, 1968, California time. However, although this Agreement may have been terminated, Painton shall pay the fees provided herein either through termination date or for a four (4) year period after achieving a production rate of 500 pcs. per month on any given model other than the "Flatpot," whichever date is later.

f) *Paragraph 7* provided that "[t]he license herein granted to Painton shall be exclusive in the territory indicated." Bourns was not to license others to manufacture the covered products in such area or do so itself "during the period of this Agreement." *Paragraph 11* restricted Painton's manufacturing and sales to the British Isles except that any of three affiliated organizations of Painton might sell products manufactured by Painton in territories specified in separate sales and distribution agreements being separately negotiated. These territories were Scandinavia, Benelux, Australia, and New Zealand.

g) *Paragraph 8,* entitled "Fees," required Painton to pay 5% of the net selling price "for products manufac-

tured hereunder and sold by Painton, with the exception of the Flatpot." On this, "which was developed and marketed by Painton prior to entering into negotiations with Bourns and not substantially modified since," the fee was to be 2½%. If the fees accruing to Bourns (exclusive of the Flatpot sales) should not amount to $2,500 in any year, Bourns might terminate the agreement. *Paragraph 9* added that Painton was to make a further payment of $1,000 "for the information covered by this Agreement as to each model, to the limit specified by Paragraph 4, not heretofore actually manufactured by Painton." Such payments were not to apply against the $2,500 minimum.

h) *Paragraph 13.* Bourns agreed to notify Painton of any United States patent applications relating to inventions applicable to the covered devices. If Painton wanted similar applications filed in any of the territory covered by the agreement, Bourns would furnish the necessary information and Painton would pay the expense. The patents would be issued in Bourns' name and Bourns would license their exclusive use to Painton "for the period of this Agreement."

i) *Paragraph 14.* All products manufactured under the agreement, except for the Flatpot, were to carry the Bourns trademark and also the word "Painton."

j) *Paragraph 16,* "Termination," provided for termination by Bourns if Painton committed any breach or default and did not rectify this within 60 days after the sending of written notice by Bourns, or if Painton filed any petition in insolvency or bankruptcy.

k) *Paragraph 17.* Except for Flatpot, Painton was not to engage in the sale of products performing the same or substantially the same function as those licensed to be manufactured.

l) *Paragraph 19,* entitled "Trade Secrets," read in pertinent part:

All of the plans, data, and technical know-how received by Painton under this Agreement or previous agreements shall be deemed and maintained confidential except information published in Bourns' catalogs.

m) *Paragraph 23* provided that

Should any dispute arise as to the legal effect of this Agreement it shall be construed under the law of California in effect on execution hereof.

Apparently during the life of the 1962 agreement, Bourns obtained British Patent No. 923,607; four models manufactured by Painton are said to have embodied features covered by it.

## II.

On August 13, 1968, Bourns wrote Painton as follows:

As you no doubt are aware, our Manufacturing Agreement of November first 1962 expires on midnight October 24th of this year. As a matter of courtesy I am, therefore, writing to inform you that we do not intend to renew this Agreement and we shall be obliged if Painton will return to us on or before the expiry date any drawings; tables of data; manufacturing, engineering and quality control instructions; techinical information and any other related written or printed matter received by you as a result of the Manufacturing Agreement.

This led to Painton's filing the complaint herein on September 26, 1968. Asserting that it had paid more than $340,000 for the drawings and other material mentioned in Bourns' letter, with an additional payment shortly to become due, it sought a declaration that it was entitled to their permanent retention and use "free of any claim for infringement, royalty or otherwise" by Bourns except for Painton's undischarged obligations to make payments under the four-year clause of Paragraph 6 and its duty to

maintain secrecy under Paragraph 19. Bourns answered and counterclaimed. It sought a declaration and injunction denying Painton the right to retain or use the drawings, etc., and to manufacture any models based thereon, after October 24, 1968, except as to models on which a production rate of 500 pieces per month had not been achieved by October 24, 1964 and that as to such models the right would terminate four years after such a production rate had been achieved.

Painton took the depositions of the following Bourns' personnel: Marlan E. Bourns, president and chairman of the board; Richard C. Archer, vice-president of international operations; Walter K. Deacon, division manager of the Trimpot division; John E. Quinton, an application engineer; and Raymond T. Lloyd, controller. In the course of these it introduced a number of exhibits relating to the 1962 negotiations and to other matters. It also propounded interrogatories which Bourns answered. Upon the basis of these and affidavits of Painton's managing director and executive chairman, Cedric M. Benham, its joint managing director, Robert W. Addie, its secretary and chief accountant, Derrick S. Pyke, and its American counsel, C. Dickerman Williams, Painton moved for summary judgment. Bourns responded with a cross-motion for summary judgment, supported by affidavits of Messrs. Bourns, Archer, and Carlisle M. Moore, counsel for Bourns, by Painton's answers to Bourns' interrogatories, and by much of the same material underlying Painton's motion. There were a number of further affidavits, some commenting on contentions made in the briefs and on the statements made in the earlier affidavits.

The district judge first decided, 309 F. Supp. 271, 273–274, without benefit of brief or argument from the parties who had been concerned solely with the issue of contract interpretation, that regardless of the construction of the 1962 contract, the Supreme Court's decision in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S. Ct. 1902, 23 L.Ed.2d 610 (1969), prevented judicial enforcement of Bourns' claims for trade secrets with respect to any models covered by British Patent No. 923,607—presumably, although the opinion does not say so, unless and until the validity of the patent should be upheld. The judge then made the broader holding, similarly without benefit of brief or argument, that, even as to models for which Bourns had made no patent application, Painton was not required "to make any future payments," including those under the four-year clause which it did not contest, since "[o]ur patent policy of strict regulation of inventions would be undercut if inventors could enforce agreements for compensation for alleged secret ideas without being required to submit those ideas to the Patent Office, and, thereby, eventually have the ideas disclosed to the public." [1] 309 F.Supp. at 274. Turning to the real issue in the case, namely, Painton's continued right to use the trade secrets, rather than an obligation to make payments which Bourns had not asserted save under the four-year clause and Painton had conceded as to that, the court ruled against Bourns in a footnote, 309 F.Supp. at 276 n. 12, saying "Federal patent policy, the court has held, will not allow state trade secret claims against a party who has expressly contracted for them when there has been no patent application."

The judge then went on to consider, as an alternative ground, the issue of contract construction which had been extensively argued. She concluded that Painton could continue to use the drawings "and to manufacture the unpatented potentiometer models in question" free of any trade secret claim. 309 F. Supp. at 274. On the other hand, the court held that Painton was not entitled to summary judgment declaring it could retain and use the drawings, etc., sup-

---

1. The opinion reserved the question, left open by the Supreme Court in Lear, Inc. v. Adkins, *supra*, 395 U.S. at 674–675, 89 S.Ct. at 1913, "whether under California law an inventor, if he makes a patent application, can be compensated for his disclosure before the patent has issued." 309 F.Supp. at 274.

plied to it by Bourns free of any claims under Bourns' British patent.

The court thereupon entered an order dated February 4, 1970 as follows:

> In accordance with the opinion of this court rendered simultaneously herewith it is now, ORDERED:
>
> 1. Plaintiff's motion for summary judgment declaring that it is free of any trade secret claims as to non patented models is granted;
>
> 2. Plaintiff's motion for a similar declaratory judgment that it is free of any patent claims is denied;
>
> 3. Defendant's motion for summary judgment is in all respects denied, except that, as stated in the opinion, it may have a claim for patent infringement under British law.

Two months later it supplemented this with an order reading in pertinent part as follows:

> Both parties have moved the court under Rule 54(b), Fed.R.Civ.P. to direct the clerk to enter judgment on the trade secret claim.
>
> The court concludes "that there is no just reason for delay," and directs the Clerk to make an entry of final judgment on the trade secret claim pursuant to paragraphs 1 and 2 of this Court's February 24, [*sic*] 1970, order herein attached.

The clerk did so. Bourns has appealed from paragraph 1 of the order. Painton has cross-appealed from paragraph 2 and has supplemented this with a petition for a prerogative writ, of which more hereafter.

### III.

The portion of the district court's opinion denying judicial enforcement of

agreements for the licensing of trade secrets [2] at least with respect to which no patent application has been made, 309 F. Supp. at 273–274, and apparently even their sale insofar as any portion of the purchase price remains unpaid, has caused widespread concern. We have received *amicus* briefs attacking the decision from the New York Patent Law Association and Roger M. Milgrim, author of a treatise on the subject of trade secrets, and the decision has already elicited critical law review comment, 84 Harv.L.Rev. 477 (1970); 48 Tex.L.Rev. 1399 (1970); Milgrim, Sears to Lear to Painton: Of Whales and other Matters, 46 N.Y.U.L.Rev. 17 (1971); see also Arnold & Goldstein, Life Under Lear, 48 Tex.L.Rev. 1235, 1254 (1970). Painton does not seek to sustain the decision of which it was the unexpected beneficiary; it says "[i]t must decline to argue the question of trade secrets validity on the present record and at the present time."

Although ultimate decision in Painton's favor on the question of contract interpretation would deprive the holding here under discussion of most of its importance for this case, we are nevertheless constrained to deal with it. So long as the district court's opinion stands, it will almost certainly produce extensive but, in our view, abortive litigation with respect to trade secret agreements. Moreover, the holding with respect to the unenforceability of the agreement has the effect of relieving Painton of payments under the four-year clause which its construction of the contract would not. In discussing the issue we shall put aside for the time being the special problem of the four models that may be covered by the British patent.

The view of the district court that a trade secret agreement of the sort here

---

2. Our use of the term "trade secret" is in the broad sense of any unpatented idea which may be used for industrial or commercial purposes, not in the more restricted sense of "a term of art referring to some forms of know-how which have a high degree of secrecy and novelty, and to some commercial secrets such as customer lists." 84 Harv.L.Rev. 477 (1970). A comprehensive definition of a trade secret is provided by ALI, Restatement of Torts § 757 (comment b) (1939). We assume the district court did not mean to outlaw agreements protecting trade secrets where a confidential relation already existed, e. g., as between employer and employee.

at issue is contrary to public policy,[3] at least until a patent application is filed, seems to rest on two rather different legal theories. One takes off from the dissent of three Justices to the portion of the *Lear* opinion which left open the enforceability of a contract requiring payments for the disclosure of an invention during the period when a patent application is pending, 395 U.S. at 676–677, 89 S.Ct. 1902. The argument is that for a state to recognize an agreement requiring payment for trade secrets during its term or their return and a cessation of use on its expiration, would run afoul of the determination in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), that state laws prohibiting the copying of articles not protected by valid patents or copyrights but offered for public sale were inconsistent with the federal patent and copyright laws. In his partial dissent in *Lear*, Mr. Justice Black explained those decisions, which he had written for the Court, as resting on the basis "that no State has a right to authorize any kind of monopoly on what is claimed to be a new invention, except when a patent has been obtained from the Patent Office under the exacting standards of the patent laws," 395 U.S. at 677, 89 S.Ct. at 1914.

■ With great respect, this very statement seems to us to show the inapplicability of *Sears* and *Compco* to the problems at issue in the disputed portion of *Lear* and here discussed. The Illinois law of unfair competition invalidated in *Sears* and *Compco* did confer a monopoly against copying an article otherwise in the public domain, a monopoly good against non-contractors just as a patent or copyright would have been. As Mr. Justice Black there pointed out, the Illinois law afforded protection quite similar to that given by the patent and copyright statutes [4] but free from their safeguards and limits of time. An agreement licensing a trade secret is an altogether different matter. It binds no one except the licensee; all others are free, as the licensee previously was, to attempt by fair means to figure out what the secret is and, if they succeed, to practice it.[5] See Speedry Chemical Products, Inc. v. Carter's Ink Co., 306 F.2d 328, 330 (2 Cir. 1962). Rather than having a monopolistic tendency, like the Illinois law involved in *Sears* and *Compco*, the upholding of private agreements for the sharing of trade secrets on mutually acceptable terms tends against the owner's hoarding them. See 84 Harv.L.Rev. at 484.

■■ The other legal theory is that protecting trade secrets in advance of the filing of patent applications is against public policy since it will discourage such applications. The district court thought this to be true because, under *Lear*, once a patent issues the patentee cannot force an unwilling licensee to pay royalties until and unless the patent is determined

---

3. From an analytical standpoint we should approach the question in two steps: (1) Would California, in the light of *Lear*, continue to hold a trade secret agreement enforceable as a matter of state law? (2) Would such a holding violate federal law? However, we have been cited to no California decisions since the remand in *Lear* that that would assist us in resolving the first question. We shall therefore assume that California will adhere to its long established rule upholding trade secret agreements to the extent permitted by federal law. For citation of many post-*Lear* cases relating to trade secrets, see Milgrim, *supra*, 46 N.Y.U.L.Rev. at 23–24 n. 31.

4. It was, of course, less extensive than the patent law since it applied only to copying.

5. As Bourns suggests, there was nothing to prevent Painton, before it entered into the agreement, or anyone else, from prying open the unpatented Bourns potentiometers, ascertaining the arrangement of the parts, and copying this. What such a procedure would not reveal was the technical know-how which Bourns employed in the manufacture of the devices. Anyone could attempt to acquire this through experimentation, but Painton preferred to pay Bourns for instruction.

to be valid. Hence, it is claimed, an inventor will refrain from applying for a patent if he is allowed to benefit from a trade secret license, and the public will be deprived of learning of his invention. In analyzing this argument, it is useful to distinguish three categories—(1) the trade secret believed by its owner to constitute a validly patentable invention; (2) the trade secret known to its owner not to be so patentable; and (3) the trade secret whose valid patentability is considered dubious.

We think it rather fanciful to assume that in the first category there will be substantial withholding of patent applications in favor of trade secret agreements. A licensee will not pay as much for a license of unpatented know-how, even if it be exclusive, which carries no protection against the world, as for such a license of a valid patent. Moreover, the licensor incurs serious detriments by failing to apply for a patent. The secret may leak, or be leaked in a way that cannot be proved to be a breach of the agreement. The inventor will forfeit his right ever to get a patent if he does not apply within a year after the invention was "in public use or on sale," 35 U.S.C. § 102(b),[6] and another who makes the invention may be able to secure a patent if he can establish that the earlier inventor suppressed or concealed it, 35 U.S.C. § 102(g). This shows that any conflict between patent policy and trade secret agreements in the context being here considered is readily resolved not by refusing to enforce a trade secret agreement but rather by refusing to grant or uphold a patent when the inventor has unduly delayed his application after the invention has been put to use.

The second category affords even less reason for a rule invalidating trade secret agreements. A great deal of "know-how," perhaps including much of that in the instant case, "is unpatented because unpatentable—that is, without sufficient utility, novelty, and/or nonobviousness to qualify for a patent," 84 Harv. L.Rev. at 481. There can be no public interest in stimulating developers of such know-how to flood an overburdened Patent Office with applications or what they do not consider patentable. Indeed, in many cases, they could not honestly take the oath required by 35 U.S.C. § 115 and 37 C.F.R. § 1.65. Such developers will not, or at least should not, apply for patents in any event, and a rule invalidating the licensing of their know-how "will have the detrimental effect of limiting the use to which the ideas are put, con-

6. "Public use or sale" may be found even though the inventor has contracted for secrecy by a user or, for that matter, has practiced the invention solely for his own purposes. The reasons were expounded long ago in Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 18, 7 L.Ed. 327 (1829):

If an inventor should be permitted to hold back from the knowledge of the public the secrets of his invention; if he should, for a long period of years, retain the monopoly, and make and sell his invention publicly, and thus gather the whole profits of it, relying upon his superior skill and knowledge of the structure; and then, and then only, when the danger of competition should force him to secure the exclusive right, he should be allowed to take out a patent, and thus exclude the public from any further use than what should be derived under it, during his fourteen years; it would materially retard the progress of science and the useful arts,

and give a premium to those who should be least prompt to communicate their discoveries.

Judge Learned Hand restated the reasoning in Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516, 520 (2 Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946):

it is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly * * * if he goes beyond that period of probation [the one-year limit on public use], he forfeits his right regardless of how little the public may have learned about the invention * * [since it is] the fiat of Congress that it is part of the consideration for a patent that the public shall as soon as possible begin to enjoy the disclosure.

trary to the public interest in maximizing the utilization of intellectual resources," 84 Harv.L.Rev. at 481.

Since a rule invalidating the licensing or sale of know-how is not needed to promote patent applications in the first category and in the second would not promote any valuable ones and would be actually detrimental to the public interest, any case for such a rule must hinge on the third category—where the inventor is doubtful whether he can get a patent or, at least, a valid one. While a rule invalidating trade secret agreements might well have some tendency to stimulate patent applications in this category, the beneficial effect even here is by no means clear. If the patent does not issue, there will have been an unnecessary postponement in the divulging of the trade secret to persons willing to pay for it. If it does, it may well be invalid, yet many will prefer to pay a modest royalty than to contest it, even though *Lear* allows them to accept a license and pursue the contest without paying royalties while the fight goes on. The result in such a case would be unjustified royalty payments from many who would prefer not to pay them rather than agreed fees from one or a few who are entirely willing to do so.

We therefore do not find, either in general considerations of public policy or in emanations from the federal patent law, a sufficient basis for declining to enforce even the royalty provisions of trade secret agreements, at least with respect to cases where no patent application has been filed. Whatever the impact of *Lear* may be with respect to agreements governing inventions for which patent applications have been filed, we find no suggestion in the opinion that the Court intended to cast doubt on the long-standing principle that an inventor who chooses to exploit his invention by private arrangements is entirely free to do so, though in so doing he may thereby forfeit his right to a patent. Although the Court stated that "federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent," 395 U.S. at 668, 89 S.Ct. at 1910, 23 L.Ed.2d 610, it did not say or suggest that federal law requires that all ideas must be put in general circulation. Indeed, as the Court observed on another occasion, the inventor "may keep his invention secret and reap its fruits indefinitely." United States v. Dubilier Condenser Corp., 289 U.S. 178, 186, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933). We do not need to rely on the familiar aphorism that public policy "is a very unruly horse, and when once you get astride it, you never know where it will carry you," Richardson v. Mellish, 2 Bing. 229, 252 (1824), although it is not without aptness here. The validity of agreements for the sale or license of trade secrets has been upheld for generations in too many cases to warrant extended citation, see Note, Nature of Trade Secrets and Their Protection, 42 Harv.L.Rev. 254, 255 and cases cited in notes 5 and 6 (1928); 5 Williston, Contracts § 1646 (Rev. ed. 1937); Milgrim, Trade Secrets § 3.02 (1970). It suffices here to refer to our own recent decision in Imperial Chemical Industries Ltd. v. Nat'l Distillers & Chemical Corp., 342 F.2d 737 (2 Cir. 1965), modified on the basis of new findings of fact on remand, 354 F.2d 459 (2 Cir. 1965). In thousands of contracts businessmen have divulged such secrets to competitors, dealing at arms' length and well able to protect themselves, on the faith that mutually acceptable provisions for payment, for the preservation of confidentiality, and for the return of the secret information on termination or default will be enforced by the courts. Provisions against competition not utilizing the trade secret, after expiration of the agreement, are a different matter which must be judged on their own facts. The district judge cited no data to prove that licensing of trade secrets had worked adversely to the public interest. To the contrary, such facts as have been brought to our notice indicate that the sharing of technological know-how on the basis of proper agreements has been

beneficial not only within this country but in its relations with others.[7] In the absence of empirical evidence of harm, a settled rule of contract law on which so much has been staked should not be overturned save on a clear showing that it is inconsistent with other rules of higher sanction or that the conditions that gave it birth no longer prevail. There has been no such showing here.

There remains in this part of the case only the holding that under the *Lear* decision Bourns cannot enforce claims for fees on the four models embodying features covered by British Patent No. 923,-607 if Painton wished to contest its validity. What *Lear* precisely held was that the courts may not enforce a royalty agreement with respect to an invention embodied in an American patent while the licensee was contesting its validity and could recover only when, as and if validity was established. We do not know whether the Court will apply the same rule to foreign patents or what it will say with respect to an agreement concerning supplementary know-how of

a sort not required to be revealed in the patent application. Furthermore, this whole issue would be rendered academic if the patent is ruled to be valid. Because of these considerations and the ambiguities in the record as to just what is involved in this phase of the case, we leave this matter open for appropriate consideration in the district court on the remand we are directing.[8]

## IV.

The effect of termination of the agreement upon Painton's continued right to retain drawings and use information that had been supplied thereunder is a most difficult question of contract interpretation. Neither the contract nor the numerous affidavits, depositions and exhibits speak to us with the clarity they did to the district judge.

Bourns stresses the contract's references to the grant of a license. It states, with seeming correctness, that all rights granted by a license generally cease upon its expiration, citing particularly the California decision of *King v. Gerold*, 109

7. A particular irony of the district court's decision is that among the chief beneficiaries of a rule designed to promote American patent applications would be foreign companies that have cheerfully made the same type of agreements for the use of trade secrets as Painton did. Milgrim's *amicus* brief suggests that the loss of foreign dollar payments might run as high as $1 billion annually; certainly it would be very large.

8. We likewise need express no opinion with respect to other troublesome problems left in the wake of *Lear* concerning the rights of parties who have entered into an agreement covering a patented invention where the patent is ultimately held invalid. Assuming, for example, that the patent at issue in the instant case should ultimately be so held but that the contracts were to be construed as Bourns contends, could Bourns recover the physical items, drawings and the like, which it supplied to Painton with respect to the "patented" invention and limit Painton to the disclosures in the patent application? The Court in *Lear* was careful to limit its holding, insofar as here relevant, to the interaction between patent validity and the enforceability of royalty agreements

with respect to the patented invention after the patent had issued. It expressed no opinion on other matters, e. g., the return of drawings, etc., or the recovery of royalties voluntarily paid. If the agreement were considered illegal as "opposed to public policy," one might be inclined simply to leave the parties where they are, see ALI, Restatement of Contracts §§ 512, 598 (1932); but with respect to the recovery of royalties voluntarily paid, see *id.* § 601. On the other hand, since the Court spoke only of the unenforceability of the contract—and a conditional unenforceability at that—it might be willing to recognize aspects of the agreement less offensive to the policy of the patent laws, e. g., a provision for the return of drawings, and also not to go to the extent of requiring reimbursement of royalty payments voluntarily made. *Cf.* ALI, Restatement of Contracts § 13 (1932). Since Painton has made no request for reimbursement, and indeed is quite willing to continue payments under the four-year clause, such questions may prove academic if its position on contract interpretation is sustained.

Cal.App.2d 316, 240 P.2d 710, 712 (Dist. Ct. of App.1952). Cf. Sloan v. Mud Products, Inc., 114 F.Supp. 916, 928 (N.D. Okl.1953). It contends that the logical necessity for reaching this result is all the more apparent because of provisions for termination of its agreement with Painton short of the expiration date. Counsel argues that if Bourns had terminated, say in 1964, because of failure to receive annual fees of $2,500, it would be absurd and unjust that Painton should forever be able to use all the information Bourns had furnished, free of any obligation of payment save under the four-year clause of Paragraph 6.[9] It would be equally absurd and unjust, Bourns argues, that Painton should have such rights if Bourns terminated for default.

Painton responds that, although Paragraph 4 is captioned "License Granted," the portion with which we are here involved is not truly a license but a duty on Bourns to furnish a continuous flow of information. The "license" was rather "the *exclusive* right and license to use such information in the geographical area defined by this Agreement." (Emphasis added.) Painton concedes that exclusivity has terminated, even with respect to items subject to the four-year clause for which Bourns agrees Painton may use the data Bourns has supplied. Painton claims it would be absurd that Bourns should be obligated to furnish information, relating to old as well as new models, up to the very hour of expiration, as Bourns in fact did, if Painton was required immediately to return this. It says that if Bourns had wanted the draw-

ings and other data returned on termination or to prevent Painton's making use of them thereafter, it should have so provided, and cites sample clauses to that end recommended in a treatise, Eckstrom, Licensing in Foreign and Domestic Operations, published in 1958, and others appearing in California cases, York v. Strommen, 105 Cal.App.2d 586, 234 P.2d 134 (Dist.Ct. of App.1951), and King v. Gerold, *supra*. It argues that, in the absence of such a provision, termination simply ended Bourns' obligation to furnish information (Paragraph 4), Painton's exclusive rights (Paragraphs 4 and 7), Painton's obligations to make payments save as extended by the four-year clause (Paragraph 8), Painton's rights to use the Bourns trademark (Paragraph 14), and Painton's obligation not to engage in the sale of products competing with those licensed (Paragraph 17), but left unimpaired Painton's right to use information already acquired, qualified only by the four-year payment obligation and the continued duty to preserve confidentiality (Paragraph 19).[10]

In seeking to resolve the conflicting contentions, we must look first to California law, which the agreement made applicable. The California Civil Code, dating back to 1872, contains provisions with respect to contract interpretation startling in their modernity. The few sections that are at all relevant are quoted in the margin [11] and we shall discuss them later.

The only California decisions cited as being truly in point are King v. Gerold, *supra*, and, more importantly, the portion

---

9. On Painton's construction there would not even have been that obligation under the 1958 and 1960 agreements.

10. A further argument, mentioned but not strongly relied upon, is that Paragraph 1 of the 1962 agreement released any claims with respect to Painton's use of information furnished prior to its date. We do not find this point impressive.

11. § 1649. Interpretation in sense in which promisor believed promisee to rely. If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor

believed, at the time of making it, that the promisee understood.

§ 1654. Words to be taken most strongly against whom. In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party; except in a contract between a public officer or body, as such, and a private party, in which it is presumed that all uncertainty was caused by the private party.

of the opinion in Adkins v. Lear, Inc., 67 Cal.2d 882, 64 Cal.Rptr. 545, 558–560, 435 P.2d 321, 334–336 (1967), rev'd on other grounds, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), rejecting Lear's contention that, as a matter of contract interpretation, it was entitled to continue to use Adkins' invention despite its exercise of a right to terminate; indeed, Bourns contends that decision to be controlling in its favor. We do not find it so; the most that can be said is that it is more favorable to Bourns than to Painton. Lear's agreement with Adkins contained two clauses permitting Lear to terminate. The one here pertinent allowed Lear generally to terminate any one or more of the licenses granted on ninety days prior written notice. The other provided that if the Patent Office refused to issue a patent on the substantial claims of Adkins' application or if a patent was issued and held invalid, Lear could terminate the specific license affected or the entire agreement and no further royalties should then be payable. Relying on certain adverse action by the patent examiner, Lear had served a notice of termination while proceedings before the Patent Office were still pending, but the court held this was not within the purview of the second clause. Lear asserted the notice was good in any event under the first termination clause and buttressed its right to continued use on another provision of the agreement whereby if it did not pay minimum royalties of $500 a year, Adkins could cancel the agreement and, if he did, Lear was expressly prohibited from using the invention. The court refused to draw from this an inference that the parties intended Lear to be able to use the invention beyond the life of the agreement if it terminated under the first clause.

It pointed to the fact that there was likewise no express prohibition on Lear's continued use if it defaulted on payment of earned—as contrasted with minimum—royalties, yet thought it "absurd" to suppose it was intended that Adkins could not prohibit continued use in that event.[12] The court thought it equally unlikely that Adkins would have entered into an agreement giving Lear the right to use his invention free of royalty merely for the $500 paid as consideration, pointing out that so broad a construction of the first termination clause would render the second "almost wholly redundant." It accepted Adkins' view that the purpose of the first termination clause was simply to allow Lear to avoid its obligation to pay minimum royalties if it decided it did not wish to use his invention. While the result of the case was to hold that Lear had no post-termination rights of use, it is thus a long way from declaring this to be a universal rule.[13]

The present case is therefore decidedly one where, as Chief Justice Traynor has said, "rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 69 Cal.Rptr. 561, 565, 442 P.2d 641, 645 (1968). The most pertinent evidence of this nature lay in the negotiations following Bourns' attempt to terminate the 1960 agreement in 1962 and, to a lesser extent, a buy-out of Painton's rights proposed by Bourns in 1965. We shall begin with the documents.

On April 13, 1962, Mr. Bourns wrote to Mr. Benham, executive chairman and managing director of Painton, detailing the grounds of Bourns' dissatisfaction

---

12. This portion of the opinion does work somewhat in Bourns' favor. See the discussion in the text, *supra*. Although *Lear* was decided after the execution of the 1962 agreement, neither party claims it to be irrelevant on that score.

13. Indeed, as the court said in disavowing reliance on cases suggesting results different from the one it reached:

> A number of cases are cited in support of Lear's argument and, while their holdings favor Lear, they make clear that the ultimate consideration in determining whether to imply a covenant in an agreement is the intention of the parties as shown by the contract construed as a whole.

64 Cal.Rptr. at 558, 435 P.2d at 334.

with their existing relationship and proposing some changes in the then existing agreement "[a]s the possible basis for a more equitable arrangement." Most vital for our purposes was that "[t]he royalty rate would be changed to a flat 5% for as long as Painton continues to manufacture the items covered by the Agreement." There was also a provision whereby if Painton decided to enter into the manufacture of any model not now being produced, it would pay Bourns "an initial lump sum (possibly $1,000) for process and design information, drawings, engineering coordination time, etc." Sales coverage in any territory might be reviewed by Bourns at six-month intervals and it might substitute other selling organizations if they were felt to be more satisfactory than the existing Painton agent or branch.

Benham answered in a letter of April 20, 1962. While he did not consider any down payment for new models to be justified, he offered $500 per model as a compromise. He objected to raising the royalty from 3½% to 5% but did not comment on the proposal that this should continue so long as Painton manufactured items covered by the agreement. Most of the letter dealt with other problems not directly relevant here.

Mr. Bourns answered on June 11. His major demand was that "the present manufacturing agreement be modified to give Painton exclusive manufacturing rights for Bourns worm gear and leadscrew actuated potentiometers in Great Britain for sale of these products in Great Britain only." He retreated to a royalty rate of 3½% but persisted in the demand that payments continue as long as Painton manufactured each model, irrespective of the duration of the agreement. Painton's $500 lump sum offer for each model was accepted.

Benham answered on July 6. He insisted that Painton remain Bourns' exclusive selling agent in Great Britain and other countries of the Commonwealth (except Canada), Sweden and the Benelux countries, and be compensated for its loss of rights elsewhere. He proposed to proceed with the negotiation of a new agreement along these lines. Nothing was said about Bourns' proposal that royalties be paid as long as Painton continued to manufacture.

On August 1, 1962, Bourns sent Benham a draft of the new manufacturing agreement. Bourns also enclosed sales and distribution agreements to be separately concluded with Painton and various subsidiaries, which were to cover the British Isles, Australia, New Zealand, Sweden, and the Benelux countries. "As compensation for moneys spent and services performed" in those areas in which Painton would no longer have selling or manufacturing rights, Bourns was to pay Painton royalties over a two-year period for certain sales made by Bourns in France, Italy, Switzerland, West Germany and Austria. Paragraph 6 of the Manufacturing Agreement provided for termination on October 24, 1968. "However, although this Agreement may have been terminated, Painton shall pay the fees provided herein so long as it continues to manufacture products for which it has received the design and/or other information from Bourns." Fees were to be 3½%, except for Flatpot on which they were to be 3% for the first year and 2½% thereafter. The lump sum payment for new models was to be $500.

In anticipation of a meeting to be held in New York on September 10, Painton's representatives had delivered a counterdraft to Bourns' representatives on the previous day. For our purposes the important change was in Paragraph 6, reverting in effect to the scheme of the earlier agreements, which read as follows: [14]

14. Painton's counterproposal was more favorable to itself with respect to the geographical scope of its manufacturing and selling rights which included the British Isles, the Commonwealth (less Canada), Europe, and Africa.

The term of this Agreement shall be for a period of six years from the date hereof and shall continue thereafter until either party to this agreement elects to terminate or modify the agreement by serving the other party with six months written notice of such intention.

A copy of Painton's proposal produced from Bourns' files bears the pencil notation immediately thereafter: ·  ···  ,

They have deleted fees for life of products. Fees for 4 years after mfg at continuing rate of ...... per month.

The record sheds little light on when or by whom this notation was affixed,[15] and the briefs do not discuss this.

At the New York meetings Bourns was represented by Mr. Bourns, Mr. Archer, and Mr. Zack, its attorney, Painton by Mr. Addie and Mr. Williams, its American counsel. At the conclusion of this meeting Mr. Williams, in the presence of the other participants, dictated a memorandum outlining the points of "possible agreement" and the areas of difference. Among the former were that "the existing royalty would be increased from 3½% to 5% on Painton produce [sic] Bourns originating products. On flatpot the royalty would be as at present, 2½%," and the lump-sum payment on new models would be increased to $1,000. Among the latter was the issue of payments after termination. On this the memorandum stated:

4. Painton proposes to pay, on all models it sells based on Bourns designs, the above royalty for a minimum of three years from the date of first sale or until termination of the contract, whichever occurs last.

Bourns feels that the royalties on designs which it has provided Painton should be paid on all sales for a period of three years after termination of the agreement.

On the territorial issue Painton insisted on the right to sell in England and on the continent of Europe without restriction. Also in countries where it had a subsidiary it wished to sell the complete lines of both parties up to an established point in volume.

Bourns, Archer, Benham and Addie met in Basle, Switzerland, on October 16, negotiated there, and then adjourned to London. In one place or another the agreement was redrafted substantially in its final form. On October 18 Mr. Bourns wrote from London to his assistant Teaford in Riverside, California, enclosing the revised drafts of the manufacturing and sales agreements for examination. He said that at Basle the Painton representatives "weakened very drastically and unexpectedly as can be seen by enclosed agreements which have been tentatively agreed to by all in every basic area." He characterized the "main points of settlement" as follows:

We get continent except 3 subsidiaries. We sell whole line thru 3 subsidiaries on fairly standard terms and 1, 2 and 3 year cancellation. They still manufacture but pay 5%, $1,000 for each new model and pay for 4 years after reaching sizable production rate specified.

In a letter written the next day, apparently from London, Bourns sent to Benham copies of what became the final agreements and made the following comment in reference thereto:

You will note several liberalizations in line with verbal and written suggestions presented by yourself and Mr. Addie, and inserted voluntarily in an effort on our part to make the new Agreements more advantageous to you.

On November 1, 1962, the agreements became effective.

On May 14, 1965, Mr. Bourns wrote Benham about a possible purchase "of Painton's licensed rights" as an alterna-

---

15. Indeed, the joint appendix prints the notation as if it were part of the Painton draft; its true nature emerges only from scrutiny of the exhibit.

tive to "open competition" that Bourns suggested might develop upon the termination of the exclusive sales agreement for the British Isles, which Bourns was free to cancel upon ninety days notice, after November 1, 1965. He explained how he had arrived at "a tentative figure of $350,000 for your remaining manufacturing and sales rights under the Agreement of October 28, 1962." He added "that we have not attempted to estimate a value for the license beyond October 31, 1968, when the license expires" and suggested that Painton do this, taking into account:

1. Competition with Bourns on a manufacturing, as well as a sales, basis at that time.

2. Cutoff of all technical assistance, product improvement information, piece part supplies, etc., from Bourns.

3. Vigorous prosecution of Bourns patent and trademark rights in the U. K.

Although the record does not contain the ensuing correspondence in its entirety, Benham countered Bourns' offer with a figure of £1,000,000, while expressing some disagreement over the parties' respective rights under the English sales agreement noted above, and Bourns then indicated that it appeared "unlikely that there is any ground for further negotiations with respect to Bourns' purchase of Painton's rights under the manufacturing Agreement." No further light was shed by these letters on what the parties thought these rights were, particularly upon termination.

Whatever may have been the situation prior to 1962, Bourns made clear by its letters of April 13 and June 11 and by the draft dispatched on August 1, that it did not intend Painton to be able to use its data for manufacture after termination without continued payment of the fees. The critical issue is what inference is to be drawn from Painton's refusal to accept Bourns' proposal. Painton argues that Bourns withdrew its general de-

mand, being satisfied by Painton's acceptance of an increase from 3½% to 5% in the rate, the $1,000 down payment for new models, the assurance of continued payment on new models for four years after production had reached 500 pieces per month, and the territorial limitations on Painton's manufacturing and selling rights. Bourns contends there was no such retreat; the provision allowing Painton to use information beyond the expiration of the license in connection with models on which it had not had a long period of production, with payment of the regular fees, was not a *quid pro quo* from Painton for Bourns' abandoning its general position against continued use without payment but rather was inserted in recognition of the fact, stressed vigorously by Painton, that it would be anomalous that information on new models delivered only a short time prior to termination could not be used after that date; hence, the four-year period "gave both parties an opportunity to recover their expenses."

In the nigh interminable affidavits each side refers to alleged oral statements supporting its version of what occurred. Mr. Benham averred that at the Basle meeting, "My argument against an indefinite continuance was that we could not afford to pay fees when we were no longer receiving assistance and that he would find that the fees he would get by the time of termination would be sufficient." He added that "Mr. Bourns must have known that we assumed that upon termination we would have a continued right of manufacture because our counterproposal contained no provision for post-termination fees but the discussions at both conferences showed that we expected to manufacture after termination." Of interest in this connection is that at the New York meeting Bourns had already receded from its proposal of perpetual payment on all designs, to payment on all designs for three years after termination. We would not read this as contemplating cessation of use by Painton at the end of that time, but Mr. Bourns avers that was what he meant,

without, however, stating it was what he said. He also averred there was no assertion at the Basle meeting "that Painton would have a right to use our information or manufacture our models after their obligation to pay royalty should come to an end, and there was no intent on my part that they should have such a right." Benham directly contradicted this, averring that to the best of his recollection, he "frequently referred at the meeting in Basle to our manufacture after termination," said that he wanted this to be free of royalty, and compromised on the four-year clause. On his view, the extension of the latter from the three years discussed in New York was his response to a demand by Mr. Bourns in an effort to obtain larger post-termination fees rather than an effort on his part to get longer rights on new models as Mr. Bourns alleged. Conflicting inferences are drawn from Mr. Bourns' October 18 memorandum to Teaford. Painton argues that the phrase, "[t]hey still manufacture" must mean post-termination manufacture, the assumption being that the right to manufacture during the term of the agreement was too obvious for mention. Bourns draws comfort from the report in the same memorandum that Painton had "weakened very drastically and unexpectedly"; Painton says this referred to what to Bourns was the more important matter of sales territory. Bourns seeks to drain the force of its 1965 admission that the license would have a value even after expiration on the basis that Painton could continue manufacture under the four-year clause and that it had acquired much know-how not embodied in drawings, etc., the return of which could not practically be compelled. This does not fully explain why the letter spoke of the "[c]ut-off of all technical assistance" but not of the return of data Painton already had.

We do not think an easy resolution of these perplexities can be had by resorting to §§ 1649 and 1654 of the California Civil Code, see fn. 11. Section 1649 tells us that ambiguous terms "must be interpreted in the sense in which the promisor believed * * * that the promisee understood it," and that "the promisor is presumed to be such party." This is not very helpful when the question is whether a promise to return drawings, etc. was made at all. Section 1654 instructs that uncertain language "should be interpreted most strongly against the party who caused the uncertainty to exist." We find no basis for determining which party caused it here; it would have been equally easy for Bourns to have written into the contract a provision that Painton must, upon termination, return all drawings, etc. except those needed under the four-year clause and the remaining ones when the respective periods under that clause expired, or for Painton to have written a provision confirming its rights after termination to use all information provided by Bourns without fee except as provided in the four-year clause.

█ If anyone other than the parties has had the patience to read so far in this portion of the opinion, he will long since have asked himself how this controversy over the interpretation of the contract could have been thought appropriate for summary judgment. We cannot give a satisfactory answer. In this respect the case is quite reminiscent of American Manufacturers Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2 Cir. 1967), where, as Judge Kaufman remarked, the parties' "admirable harmony" that the record presented no material issues of fact "does not carry over to agreement on what the 'undisputed' facts are or the permissible inferences to be drawn from them." We there applied "[t]he well-settled rule * * * that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." 6 Moore, Federal Practice ¶ 56.13 at 2247 (2d ed. 1966). Our only hesitation in directing a trial arises from the fact that Bourns made no alternative request on that score in the district court, where it

had been represented—at least in part—by other counsel, or even in its briefs here. Despite this we have power to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106, and, for reasons that have long since become apparent, we believe our duty is to remand for trial.[16] The point that the ultimate issue, the construction of a contract, is a question of law for the court, see 9 Wigmore, Evidence § 2556 at 522 (3d ed. 1940); 4 Williston, Contracts § 616 at 649 (3d ed. 1961), does not dictate a different result. When a contract is so ambiguous as to require resort to other evidence to ascertain its meaning and that evidence is in conflict, the grant of summary judgment is improper. See 6 Moore, Federal Practice ¶ 56.17 [11] and [43] (2d ed. 1966); Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946, 950–953 (2 Cir. 1965); Lemelson v. Ideal Toy Corp., 408 F.2d 860, 862–864 (2 Cir. 1969); cf. Meyers v. Selznick Co., 373 F.2d 218 (2 Cir. 1966).

We have already indicated several areas where testimony is required. The parties are in square conflict on the vital issue how far each made known to the other, in the 1962 negotiations, its position with respect to Painton's continued right to use information supplied by Bourns in the absence of specific provision. There is also the intriguing matter of the interlineation on Bourns' copy of Painton's counter-proposal of early September, 1962. Were these made by Bourns about the time of receipt of the counter-proposal, or did they simply record the agreement ultimately reached? Evidence about any general practice concerning the return of drawings, etc. under agreements of this character might be illuminating. But even if the trial should turn out to be nothing more than a swearing contest, with the parties saying the same things in the witness chair they have said in affidavits, the court would have the benefit of observing their demeanor, particularly under cross-examination, and the case would come to us with factual findings on the disputed matters which are lacking in the opinion before us. We are far from saying that after an evidentiary hearing, the district court could not permissibly reach the same conclusion concerning the meaning of the contract that it did here. But, with Bourns proffering a different factual version of the negotiations, Painton must prove its case through the time-honored method of a trial.

V.

We turn finally to Painton's cross-appeal from the denial of its prayer for a declaratory judgment of freedom from patent claims with respect to its post-termination use of drawings, etc. supplied by Bourns, and its related petition for some kind of prerogative writ.

The cross-appeal was seemingly predicated on the ground that the district

16. We have reviewed the papers in the district court, including the statements under Local Rule 9(g) and the responses, and find nothing that would amount to an explicit waiver by Bourns of its right not to have summary judgment rendered against it if there are genuine issues of fact. We have also considered whether our decision to disregard the apparent willingness of both parties to permit decision on the basis of exhibits, depositions and affidavits is inconsistent with what we ruled in Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1204–1205 (2 Cir. 1970), where a party who would have been entitled to an evidentiary hearing on the issuance of a temporary injunction "joined the battle of affidavits with as much relish as the plaintiffs," and we refused to allow it to reverse field on appeal. We think the situation differs both because of the finality of the action here taken by the district court and because the temporary injunction cases rest on judicial implementation of the accordion-like term "hearing" in F.R.Civ. P. 65(b), whereas F.R.Civ.P. 56(c), in the plainest words, allow the entry of summary judgment only if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

court's order of April 7, 1970, purportedly gave finality to paragraph 2 of its order of February 4. We cannot tell whether the order in fact was so intended. While the April 7 order does refer to paragraph 2 of the earlier order, it is also limited to the "trade secret claims," which were dealt with only in paragraph 1. Apparently no one bothered to ask the district judge to clear up this confusion. While we could do this on our own motion, there is no reason for doing so since the certificate could not give finality to paragraph 2 of the order of February 4 even if the judge so intended.

We assume the prayer of the complaint for a declaration that Painton "may use permanently said drawings etc., free of any claim for infringement" by Bourns was broad enough to include a determination with respect to Bourns' patent rights. In any event the order to show cause on Painton's motion for summary judgment clearly sought a declaration of entitlement to freedom from harassment by reason of any claim of patent infringement, and the order to show cause on Bourns' motion sought a declaration that plaintiff had no further rights under Bourns' patents. In its opinion the district court noted that under Paragraph 13 of the agreement, Bourns licensed Painton under its patents only "for the period of this Agreement"; that, in its May 14, 1965 letter with respect to a buy-out, Bourns had asserted its intention to prosecute its British patent claims against Painton on expiration of the agreement; and that Painton had not then contested Bourns' right to do this, 309 F.Supp. at 277. This was the basis for paragraph 2 of the order denying Painton's motion for summary judgment in this regard. The court then said it would treat Bourns' "counter-claim" for declaratory relief with respect to the patents—more accurately, its motion for summary judgment in that regard—"as a demand for royalties under its British Patent No. 923,607" but would deny "defendant's motion for summary judgment on this question," 309 F.Supp. at 277—

which appears never to have been explicitly made—for want of sufficient proof.

Even if the court had before it nothing more than cross-motions for declaratory relief on the patent issue, and we think that is all that it did, the denial of plaintiff's motion for summary judgment was not a final disposition. Drittel v. Friedman, 154 F.2d 653 (2 Cir. 1946); Marcus Breier Sons, Inc. v. Marvlo Fabrics, Inc., 173 F.2d 29 (2 Cir. 1949); John Hancock Mutual Life Ins. Co. v. Kraft, 200 F.2d 952 (2 Cir. 1953); 6 Moore, Federal Practice ¶ 56.21 [2] at 2788–89 (2d ed. 1966). Yet it is settled that F.R.Civ.P. 54(b) cannot be made operative unless the district court has finally adjudicated the claim to which its certificate is directed, 6 Moore, Federal Practice ¶ 54.30 (2d ed. 1966).

Apparently recognizing this, Painton says, in its petition for a prerogative writ, that it has concluded that what the district judge had in fact done by the paragraph of her opinion relating to Painton's demand for a declaratory judgment that it might continue to manufacture free of patent claims "was to make a final declaratory judgment that plaintiff could not in fact manufacture free of patent claims." Since even this would not make the adjudication final if the court also had before it a claim under the patent, cf. Cott Beverage Corp. v. Canada Dry Ginger Ale, Inc., 243 F.2d 795 (2 Cir. 1957); Backus Plywood Corp. v. Commercial Decal, Inc., 317 F.2d 339, 341 (2 Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963); Rabekoff v. Lazere & Co., 323 F.2d 865 (2 Cir. 1963); McNellis v. Merchants Nat'l Bank & Trust Co., 385 F.2d 916 (2 Cir. 1967), Painton argues that the district court would not have jurisdiction to try such a claim since it might be obliged to declare the British patent invalid, and cites Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 647 (2 Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), as having so decided. It therefore asks us to issue a writ to correct the district court's order

so as expressly to include a finding that Painton does not have a right to continue to manufacture the potentiometers free of claims of patent infringement, or, that the Court, in the alternative, treat the order and judgment as including such a finding, [and] that the Court, having decided so to restate or treat that order and judgment, reverse that finding for the reasons set forth * * * and * * * forbid the District Court from proceeding further with the * * * claim.

In opposition, Bourns urges, among other things, that *Vanity Fair* simply sustained the district court's exercise of discretion in refusing to adjudicate the validity of a Canadian trademark in a case where this had become the principal subject of dispute, and relies on *Ortman v. Stanray Corp.*, 371 F.2d 154 (7 Cir. 1967) and especially the concurring opinion of Judge Fairchild, *id.* at 159, as holding there is no impropriety in an American court's adjudicating the validity of a foreign patent when this is part of a controversy properly before it on other grounds.

We find it unnecessary to pass on any of this. The district judge said she was merely denying Painton's motion for summary judgment seeking a declaration of freedom from Bourns' patent claims, and we see no reason to suppose she meant to do more. In any event, since the case must go back, there will be ample opportunity for clarification.

We therefore reverse paragraph 1 of the order so far as it declared the entire agreement to be invalid, and direct a trial on the issue of contract interpretation raised in the pleadings. We dismiss Painton's appeal from paragraph 2 of the order for want of appellate jurisdiction and deny its petition for issuance of a prerogative writ. This leaves the entire patent controversy, including the question of what may be Painton's special right to use trade secrets relating to models covered by Bourns' patent, open to further consideration below. Under the circumstances we think it best that costs on these appeals should abide the ultimate event.