**JON–T CHEMICALS, INC.,**
**Plaintiff-Appellant,**

v.

**FREEPORT CHEMICAL COMPANY,**
**Defendant-Appellee.**

**No. 81–2412.**

United States Court of Appeals,
Fifth Circuit.

May 20, 1983.

Brantly Harris, Houston, Tex., for plaintiff-appellant.

Lawrence L. Bellatti, Houston, Tex., for defendant-appellee.

Before BROWN, GOLDBERG and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

This diversity case arises from a suit brought by Jon-T Chemicals, Inc. (Jon-T) against Freeport Chemical Company (Freeport). The suit is based upon Freeport's alleged breach of a sales agreement. Trial was before a jury which returned a verdict in favor of Freeport. In this appeal Jon-T

complains of the district court's (i) instructions to the jury, (ii) evidentiary ruling which disallowed admission of a transcript of a taped telephone conversation between officials of Jon-T and Freeport, and (iii) grant of partial summary judgment in favor of Freeport. Convinced that the jury's verdict is supported by the evidence and the district court's actions were proper, we affirm.

On February 28, 1978, Jon-T and Freeport entered into a written contract with a two years' term whereby Jon-T agreed to buy (i) not less than 10,000 nor more than 12,000 short tons of phosphoric acid from Freeport during the first year of the contract. The first year of the contract ran from July 1, 1978 through June 30, 1979. The contract also provided that Jon-T was to buy not less than 12,000 nor more than 14,000 short tons of phosphoric acid in the second year of the contract. The second year of the contract was to run from July 1, 1979 through June 30, 1980.

On January 12, 1979 R.K. Hoddinott, vice-president and sales manager for Freeport, sent two letters to Jon-T. The first letter (the transmittal letter) referred to an attached "agreement to terminate the phosacid contract on June 30, 1979." The second letter (the cancellation agreement) confirmed the agreement effective June 30, 1979, between the parties to cancel the sales contract of February 28, 1978 (the original sales agreement) in consideration of a $100,-000 payment by Freeport to Jon-T. Both letters included an instruction that if Jon-T accepted and agreed with the provisions of the letters, it was to sign them and return copies to Freeport. Both the transmittal letter and the cancellation agreement were signed by John H. Thomas in behalf of Jon-T.

Orders for acid under the sales contract were ordinarily placed by Jon-T with Freeport by teletype or telex and were then transferred to Freeport's all rail shipping schedule. The all rail shipping schedule reflected orders placed by Freeport's customers, including Jon-T and the customers of Jon-T, such as Borden Smith-Douglas at Streator, Illinois. Prior to the time of the alleged breach, Jon-T had occasionally instructed Freeport to ship some of the acid sold to Jon-T under the sales contract to one of its (Jon-T) customers, Borden Smith-Douglas in Streator, Illinois.

Jon-T selected the route for the railcars to follow from Freeport's plant in Uncle Sam, Louisiana, to Streator. The cars were routed over the Illinois Central Gulf Railroad, the Burlington Northern Railroad, and the Norfolk and Western Railroads. The record reflects that the usual roundtrip transit from Uncle Sam, Louisiana to Streator, Illinois took 21–25 days.

When the Chicago area was crippled by severe snowstorms beginning in January 1979, the shipment of acid from Freeport's Uncle Sam plant to Jon-T's customer, Borden Smith-Douglas in Streator, Illinois, was severely inhibited. It is undisputed that adverse weather conditions existed during this portion of the contract period. The cold facts show that all kinds of weather records were set for Chicago's 1978–79 winter. Snowfall was abnormally high. It was bitterly cold.

Because of the obvious hazard created by the snow and ice, the Illinois Central Gulf Railroad embargoed shipments from Freeport into Chicago. Furthermore, the Interstate Commerce Commission issued an order [1] authorizing railroads which operated

---

1. I.C.C. Order No. 16 provided in part:

> *It is ordered,*
>    (a) *Rerouting traffic.* Any railroad operating in the Chicago switching district which is unable to interchange traffic routed via Chicago because of interference with the operations of the delivering, intermediate, or receiving line due to heavy snow, is authorized to divert or reroute such traffic via any available route to expedite the movement. Traffic necessarily diverted by authority of this or-

der shall be rerouted so as to preserve as nearly as possible the participation and revenues of other carriers provided in the original routing. The billing covering all such cars rerouted shall carry a reference to this order as authority for the rerouting.
>       \*    \*    \*    \*    \*    \*
>    (f) *Effective date.* This order shall become effective at 10:00 a.m., January 15, 1979.
>    (g) *Expiration date.* This order shall expire at 11:59 p.m., January 19, 1979, unless otherwise modified, changed or suspended.

in the Chicago area to reroute their rail traffic in order to help alleviate the problem of congestion of railcars in the area. Although occasionally Jon-T requested that Freeport deliver some of the acid to Jon-T's customers by truck instead of rail, there is no evidence that Jon-T requested shipment of acid by truck to Jon-T's customer, Borden Smith-Douglas in Streator, Illinois during the period of the embargo.

Jon-T's first damages claim is based upon Freeport's failure to sell and deliver the contractually specified tonnage of acid during the first year of the sales contract.[2] Its primary argument on this claim is that the district court committed error when it failed to instruct the jury that Freeport was required to tender delivery of the phosphoric acid by any commercially reasonable substitute for the agreed type of carrier. The agreed type of carrier specified in the contract was by train. The commercially reasonable substitute, Jon-T asserts, was by truck. The argument is based upon Jon-T's reading of the Texas Business and Commerce Code, § 2.614(a),[3] which indicates that a seller is to make delivery of the goods by any commercially reasonable substitute when the agreed type of carrier becomes unavailable. Jon-T asserts that delivery by truck would have been a commercially reasonable substitute for delivery of the phosphoric acid since weather conditions did not permit delivery by train.

█ Freeport defended against its acknowledged failure to sell and deliver to Jon-T 598 short tons of acid during the first year of the contract by relying on the *force majeure* provision in the original sales contract which excuses a failure to perform if such failure is due, among other disasters—natural or humanly wrought—to inclement weather. The *force majeure* clause provided:

6.  CONTINGENCIES:

(a) Seller shall not be liable for any failure or delay in performance hereunder which may be due, in whole or in part, to fire, explosion, earthquake, storm, flood, drought or *other adverse weather condition,* accident, breakdown of machinery or facilities, strike, lockout, combination of workmen or other labor difficulties (from whatever cause arising, and whether or not the demands of the employees are reasonable or within Seller's power to grant), war, insurrection, riot, act of God or the public enemy, law, act, order, proclamation, decree, regulation, ordinance, instruction or request of Government or other public authorities, judgment or decree of a court of competent jurisdiction, delay or failure of carriers or contractors, labor shortage or inability to obtain transportation equipment, operating materials, plant equipment or materials required for maintenance or repairs, curtailment or suspension of operations to remedy or avoid an actual or alleged violation or violations of Federal, State or local pollution standards as may be in effect from time to time during the contract period, *or any contingency or delay or failure or cause of any nature beyond the reasonable control of Seller,* whether or not of the kind hereinabove specified and whether or not any such contingency is presently occurring or occurs in the future. (Emphasis supplied)

\*      \*      \*      \*      \*      \*

It is clear from the provisions of article 6 that Freeport's failure to deliver the 598 short tons of phosphoric acid to Jon-T is excused. A contract which speaks so plainly about the duties and obligations of the parties upon the happening of identified events can hardly be interpreted to mean something totally different than what is provided by its express terms.

█ Furthermore, the sales contract also provided that delivery was to be made by rail *"unless otherwise agreed"* to by both parties. This, in effect, Freeport argues, takes the transaction outside of the Texas Business and Commerce Code. We agree with Freeport that the parties' agreement

---

The order was amended/revised some five different times. Each change extended the expiration date of the order.

**2.** It was stipulated that Jon-T ordered and Freeport failed to sell and deliver 598 short tons of acid during the first year of the sales contract.

Hence no issue exists as to the quantum of undelivered acid.

**3.** Texas, like many other states, has adopted the Uniform Commercial Code and codified it. *See* Tex.Bus. & Com.Code (Vernon 1968).

controls this transaction rather than the provisions of the Texas Business and Commerce Code.

■ Section 1.102(c) of the Code states the general rule that the provisions of the Code may be altered by separate agreement of the parties and that matters relating to contract performance may be determined by agreement. It is thus elementary that the Code's provisions are to be given controlling weight only when there is no *agreement* between the parties or when the agreement is so ambiguous it can speak with no authoritative force on the transaction. However, when the parties have contracted and negotiated a specific agreement, the Code's provisions do not control. A leading treatise in the commercial area states that "[n]early all the Code law on seller's delivery and tender of delivery is gap-filling law. The parties are free to agree as they wish and the Code applies only to fill gaps." *See* J. White and R. Summers, Uniform Commercial Code 111–12 (2d ed. 1980).

■ The sales agreement between Jon-T and Freeport expressly provided that delivery of the phosphoric acid was to be made *by rail unless otherwise agreed.* On its face, this language expresses the intention of the parties who negotiated and entered into the contract that delivery was to be by rail unless both parties *mutually* agreed to make delivery by another carrier. It was thus not error for the district court to decline to instruct the jury that Freeport should have considered delivery by truck when delivery by rail became impossible.

Despite the provisions of the contract terms, Jon-T argues that since the parties did not contract to make delivery *by rail only* then Texas Business and Commerce Code, § 2.614 imposes a duty upon the seller to tender delivery by a commercially reasonable substitute.[4] This contention might have merit were there no contract between the parties relating to the manner of delivery and the absence of such an agreement created a vacuum or an apparent ambiguity; however, the parties' agreement to deliver the acid by rail *unless otherwise agreed* does not create a gap for the relevant provisions of the Code to fill.[5] *See Eastern Airlines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 990 (5th Cir.1976) (a recognition by this court that Uniform Commercial Code § 2.615, relating to ex-

---

**4.** Section 2.614 of the Texas Business and Commercial Code states in relevant part—

(a) Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted.

The Official Code comment to this section states that the provisions of § 2.614 are applicable *in the absence of specific agreement.* Thus, the commentators are in total agreement that the operation of Section 2.614(a) can be changed by contract. As noted in 2 R. Anderson, *Uniform Commercial Code* § 2–614:3 at 293 (2nd ed., 1971):

The parties may modify to some degree the standards prescribed by Code § 2–614 by declaring what substitute performance shall be acceptable, whether any allowance is to be made for a substitution, or whether performance made in the manner contracted for is essential.

**5.** Jon-T further invokes Texas Business & Commerce Code § 2.208 relating to course of performance. Section 2.208(b) states:

(b) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.

By invoking this provision of the Code Jon-T's suggestion is that because it has occasionally requested that Freeport make deliveries of acid to its customer Borden Smith-Douglas in Streator, Illinois, this somehow established a course of dealing which made delivery by truck an agreed upon method. This argument is flawed for two reasons. First, we have already indicated that this transaction is not controlled by the Code. Second, Jon-T fails to account for its own action whenever Freeport made delivery by truck. Consistent with the contract terms, each time Freeport delivered by truck, it was done at Jon-T's specific request. Jon-T knew that to arrange for truck transportation it would have to obtain Freeport's agreement to do so.

cuse by failure of presupposed conditions could be enlarged upon or supplanted by agreement of the parties). Automatic substitute performance through § 2.614 has no relevance in this situation as the parties provided for the action to be taken if the agreed type carrier became unavailable. The contract called for mutual consulation to decide on an alternate method of delivery. Without a *mutual* agreement, a substitute method of delivery could not be provided.

Next, Jon-T contends that the district court erred in entering summary judgment for Freeport with respect to the second year of the contract. We disagree. In Texas, the determination of whether or not a contract is ambiguous is a question of law reserved to the court. *See Trinity Universal Ins. Co. v. Ponsford Bros.,* 423 S.W.2d 571, 575 (Tex.1968); *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979); *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 519 (Tex.1968). No such determination of ambiguity was made by the district court. The contract was not ambiguous. The issue was not for the jury.

Jon-T claims that the cancellation letter and the transmittal letter should be construed as one contract. With this statement, we agree. Jon-T further argues that when construing the two letters together an ambiguity results in interpreting the contract. Our agreement stops here. While it is generally true that the two letters must be construed together since they were executed contemporaneously and form a single transaction, this rule does not render a court incapable of interpreting documents according to their plain meaning discernible from the face of both. *Lawrence v. United States,* 378 F.2d 452, 461 (5th Cir.1967); *Hennigan v. Chargers Football Co.,* 431 F.2d 308, 315 (5th Cir.1970); *Richland Plantation Co. v. Justiss-Mears Oil Co.,* 671 F.2d 154, 156 (5th Cir.1982); *A.J. Robbins & Co. v. Roberts,* 610 S.W.2d 854, 856–57 (Tex.Civ. App.1980, *writ ref.* n.r.e.).

One need only glance at the two letters to discern their uniquely separate purposes. The transmittal letter's major purpose was to transmit the cancellation letter agreement. Its secondary function states the position of the parties as to the amount of phosphoric acid due under the period of the sales contract unaffected by the cancellation agreement. It does not modify the agreement that the second year of the contract is cancelled June 30, 1979 in consideration for Freeport's payment of $100,000 to Jon-T.

The agreement to terminate the contract June 30, 1979 upon Freeport's payment to Jon-T the $100,000 represents an executory accord. The accord was satisfied by performance, i.e., payment by Freeport and acceptance by Jon-T of $100,000. Thus, the district court's determination that the second year of the contract was cancelled, thereby making summary judgment appropriate, was, in all respects, proper.

Finally, Jon-T argues that the district court committed error when it failed to admit a transcript of a taped telephone conversation between officials of Jon-T and Freeport. The transcript would have demonstrated, so the argument goes, that Freeport agreed to deliver the acid despite adverse weather conditions. Time and again we have stated that the admission of evidence is within the sound discretion of the district court. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1374 (5th Cir.1981); *United States v. Ashley,* 555 F.2d 462 (5th Cir.), *cert. denied* 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977). Absent proof of abuse an appellate court will not disturb a district court's evidentiary rulings. *Excel Handbag Co. v. Edison Bros. Stores, Inc.,* 630 F.2d 379, 388 (5th Cir.1980).

In excluding the transcript, the district court observed that (i) portions of the transcript related to issues upon which it had previously granted summary judgment, (ii) deposition testimony already in evidence adequately covered the material in the transcript, (iii) Freeport would be unduly prejudiced by its admission, and (iv) under its managerial duty to achieve a just result the transcript should not be admitted. In sum, these observations point to the district court's belief that the relevance and materiality of the transcript was of considerable

doubt. *See Excel Handbag supra* at 388. Its probative value was thus outweighed by the danger of unfair prejudice and confusion of the issues before the jury. *United States v. Hearod,* 499 F.2d 1003 (5th Cir. 1974) (per curiam). Exclusion of the transcript, therefore, was not erroneous.

### CONCLUSION

To summarize, we hold that (i) Freeport was not required to seek an alternative method of delivery under the contract, (ii) the *force majeure* clause in the contract excused Freeport's obligation to deliver the balance of the acid under the first year of the contract, (iii) the district court's grant of summary judgment on the second year of the contract was correct, and (iv) the decision to exclude the trial's transcript was not an abuse of the district court's discretion.

The judgment below was correct.

AFFIRMED.