William B. PRYOR, et al., Plaintiffs,

v.

USX CORPORATION, et al., Defendants.

No. 82 CV 216 (KMW).

United States District Court,
S.D.N.Y.

Nov. 12, 1992.

Dale A. Schreiber, Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs.

Robert Bicks, Breed, Abbott & Morgan, Moses & Singer, Russell Brooks, Milbank, Tweed, Hadley & McCloy, New York City, for defendants.

## OPINION

KIMBA M. WOOD, District Judge.

Defendant USX Corporation ("USX") moves for summary judgment, and plaintiffs cross-move for partial summary judgment. I referred both motions to Magistrate Judge Leonard Bernikow who, in a Report and Recommendation ("Report"), recommended denying defendant USX Corp.'s motion for summary judgment and granting plaintiffs' motion for partial summary judgment. Also before the court is

defendant's motion to bifurcate the issue of damages and liability. For the reasons stated below, I deny both parties' motions for summary judgment and grant the motion for bifurcation.

## BACKGROUND

The facts of this case are set forth in *Pryor v. USS Corp.*, 794 F.2d 52 (2d Cir. 1986). This is a shareholder class action involving a November 1981 tender offer by United States Steel Corporation ("US Steel"), defendant's predecessor corporation, for shares of Marathon Oil Company. The tender offer stated that if the offer was oversubscribed as of the "proration date," December 4, 1981, then shares would be purchased *pro rata* from those who tendered on or before the proration date. Shareholders who were permitted to sell at the tender offer price were to earn a significant premium on their shares. The offering was oversubscribed, triggering the *pro rata* plan. Thus, as the number of extra tenderers increased, the shares that any other tenderer was permitted to sell at a premium decreased. For this reason, if US Steel overcounted its qualified tenderers, then the properly counted tenderers lost some of the premiums they would otherwise have earned. The plaintiffs in this case allege that that is exactly what happened and that this overcounting of qualified tenderers constituted both a breach of contract and a violation of Securities Exchange Act of 1934, 15 U.S.C. § 78n(d)(6) ("14(d)(6)").

In *Pryor I*, the Second Circuit Court of Appeals held that the complaint stated a cause of action under 14(d)(6). More particularly, it held that insofar as the complaint alleged that defendant had stretched the deadline for qualification and permitted late tenderers to share in its *pro rata* buy, the complaint stated a private cause action under 14(d)(6).

Plaintiffs allege that certain groups of shares were wrongly permitted to qualify for the tender offer. These motions concern two such groups: "DTC Shares" and "Late Execution Shares." Whether the DTC shares were qualified depends on whether the tender offer required *physical delivery* of the shares by the stated deadlines, as plaintiffs maintain, or whether it permitted timely delivery under the *book-entry* method used by the Depository Trust Company, as defendant maintains. Whether the Late Execution Shares were qualified depends on whether *Method 3* of the tender offer requires delivery of *certificates and a letter of transmittal* to an eligible bank by the proration date, as plaintiffs maintain, or whether it requires only that an eligible bank transmit a *guarantee communication* to Bankers Trust on the tenderer's behalf by the proration date, as defendant maintains. Magistrate Judge Bernikow decided that plaintiffs were correct with respect to both sets of shares. USX objected. For the reasons stated below, this court denies both parties' motions for summary judgment with respect to both sets of shares.

## DISCUSSION

This dispute centers on the interpretation of the tender offer. Each party argues that, without reference to extrinsic evidence, its interpretation should prevail. Each party also alternatively argues that if extrinsic evidence is considered, that evidence weighs indisputably in favor of its interpretation, and that, therefore, summary judgment is appropriate. After reviewing the appropriate standards governing summary judgment motions in this context, I will address each of these arguments with respect to both sets of shares.

### I. Summary Judgment Standards in Contract Actions

I begin by noting the standards for summary judgment where the disputed issue is the meaning of a contract. The Second Circuit recently set forth these standards in *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992). The court first explained that where there is ambiguity or where two different interpretations of a contract are equally reasonable, then the contract's meaning is an issue of fact of the sort that

generally renders summary judgment inappropriate:

> When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. *See Heyman v. Commerce and Industry Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975); *Painton v. Company & Bourns, Inc.,* 442 F.2d 216, 233 (2d Cir.1971). Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate, *see Heyman,* 524 F.2d at 1320; *Painton,* 442 F.2d at 233 ..., since it is only when there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

*Seiden,* 959 F.2d at 428. Of course, it is consistent with this view to recognize that summary judgment may be granted if, once all the facts alleged to be material to the meaning of the contract have been presented to the court, a rational fact-finder could only find for the movant.

▋ The Second Circuit next defined the sort of ambiguity that would trigger the need for extrinsic evidence.

> In the past, we have defined ambiguous language as that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968) (Mansfield, J.)). Conversely, language is not ambiguous when it has " 'a definite and precise meaning, unattended by danger

of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.2d 352, 385 N.E.2d 1280 (1978).

*Seiden,* 959 F.2d at 428.

▋ Finally, the Second Circuit stated that courts must resolve ambiguities against the party moving for summary judgment. Where both parties are moving for summary judgment, the court must resolve the ambiguity against each in deciding its motion. As mentioned above, if either party were able to present undisputed extrinsic evidence that confirmed its interpretation to such a degree that no reasonable fact-finder could resolve the ambiguity against it, that would constitute grounds for summary judgment. If, however, it would not be irrational, given the extrinsic evidence presented by both parties, to find for either party, then summary judgment should be denied to both parties.

## II. The Late Execution Shares

▋ Certain Marathon shareholders responded to the tender offer as follows. They contacted an eligible institution, and asked that institution to forward a guarantee letter to Bankers Trust by the proration date. Subsequent to the proration date, but prior to the expiration date, January 6, 1982, they deposited their shares and a letter of transmittal with the eligible institution. Within eight days of the sending their letter of guarantee to Bankers Trust, their shares and letters of transmittal were submitted to Bankers Trust. Although the question-begging nature of plaintiffs' name for these shares—"late execution shares"—is not lost on this court, this phrase was used in the Report and is used for convenience here.

US Steel treated the late execution shares as qualifying for *pro rata* treatment, and USX argues that these shares did, in fact, qualify for *pro rata* treatment

under the terms of the offer. Conversely, plaintiffs maintain that these shares did not qualify for *pro rata* treatment. Magistrate Judge Bernikow rejected USX's position and accepted plaintiffs'.

## A. *The Literal Interpretation*

Section 1 of the Tender Offer tersely states the conditions for *pro rata* treatment:

> The manner in which the Purchaser will purchase validly tendered Shares, upon the terms and subject to the conditions of the Offer, will depend upon whether the Offer is over-subscribed by Shares validly tendered at or prior to 12:00 Midnight, New York City time, on Saturday November 28, 1981 (the "Proration Date"), [as extended to December 4, 1981 by the first Supplement, PX16] and not withdrawn. Upon the terms and subject to the conditions of the Offer, if more than 30,000,000 Shares (or any greater number of Shares to be purchased pursuant to the Offer) shall be validly tendered on the Proration Date and not withdrawn, then Shares so tendered shall be purchased, as provided in Section 2, on a pro rata basis (adjusted to the purchase of fractional Shares) according to the number of Shares tendered on the Proration Date by each shareholder, and Shares tendered after the Proration Date will not be purchased.

Under the precise terms of this clause, the only shares that "shall be purchased" are the shares that are "so tendered." The phrase "so tendered" refers, given the syntax of the sentence, to shares "validly tendered on the proration date and not withdrawn."

Plaintiffs purport to ask this court to apply the unambiguous terms of this section, but it is doubtful that that is their true wish. A truly literal approach would force me to conclude that the only shares eligible for *pro rata* purchase at a premium were, as the clause says, shares validly tendered *on* the Proration date, and not withdrawn. I would therefore not consider shares tendered prior to the proration date as eligible for *pro rata* treatment. This

would be absurd, of course, because of the law, because of the practice in the industry, and because of the context of the entire section. There is every reason to believe that it was simply a case of misdrafting, and that the offeror did not intend to exclude those who had validly tendered *before* the proration date. None of the parties—and certainly not the plaintiffs, many of whom presumably did validly tender before the proration date—would question the necessity of this minor deviation from absolute literalism.

A more difficult problem separates the defendant and the plaintiffs. In determining whether the late execution shares qualify, it appears that one must determine whether the late execution shares were validly tendered on or before the proration date. The parties agree that Section 5 of the Offer of Purchase sets forth three methods of tendering, and that if only the first two methods set forth in Section 5 existed, then the shares would not qualify. However, defendant points to Paragraph 3 of Section 5, which sets forth a third method [hereinafter "Method 3"], and states that given this paragraph, the shares qualified. Plaintiffs reject this view, arguing that the shares were not validly tendered under Paragraph 3.

Plaintiffs' position is that in order for shares to be validly tendered under Section 5 by Method 3, for the purposes of qualifying for proration, two events must occur on or before the proration date: (1) the shareholder must deposit his or her shares with a letter of transmittal at the eligible institution, and (2) the eligible institution must send a guarantee to Bankers Trust. Defendant argues that the tender qualifies for proration even if only the second event occurs before the proration date, *i.e.*, if the guarantee is sent to Bankers Trust before the proration date but the shares are not deposited before the proration date.

At first blush, the plain language of Section 1 combined with the plain language of Section 5 appear to prove defendant wrong. As discussed above (ignoring, for the moment, the caveat about the word "on") Section 1 states that to qualify for *pro rata*

purchase, shares must be "validly tendered" on (or before) the proration date. Section 5, Paragraph 3 of the Offer of Purchase reads [in relevant part]:

> If a shareholder desires to accept the Offer and time will not permit such shareholder's Letter of Transmittal, certificates, and other required documents to reach the Depositary on or prior to the Expiration Date, such shareholder's tender may be effected if all of the following conditions are satisfied: ...

Three requirements are then listed: (i) the Letter of Transmittal and the shares must be deposited at the eligible institution on or prior to the Expiration Date; (ii) a guarantee letter must be received by the Depositary on or before the Expiration Date; (iii) a Letter of Transmittal, certificates, and other required documents must be received by the Depositary within eight days of the receipt of the guarantee letter.

Reading together the requirement in Section 5 that "such shareholder's tender may be effected if *all* of the following conditions are satisfied," and the requirement in Section 1 that only shares validly tendered on or before the proration date are eligible for *pro rata* purchase, it appears that shares qualifying under Method 3 must meet all of the listed conditions on or before the Proration date. If this interpretation were correct, defendant would clearly be mistaken in asserting that it was sufficient for condition (ii) to be met on or before the proration date. As the language says, *all* conditions must be met for a shareholder's tender to be effected, and proration shares require that the shares be validly tendered *on or before* the proration date. The strictly literal construction therefore undercuts defendant's view.

The matter is not so simple, however, because the strictly literal construction also undercuts plaintiffs' view. Plaintiffs contend that in order for shares to be eligible for *pro rata* purchase, conditions (i) and (ii) must be met on or before the proration date. Plaintiffs contend that condition (iii) need not be met before the proration date. This cannot be squared with the strictly literal construction, described above. I

therefore conclude that none of the parties to this litigation, and none of the parties to this contract, accepted a strictly literal interpretation of how Section 1 applied to Method 3 tenderers.

I am then left with the question of what a Method 3 tenderer must do to qualify for *pro rata* treatment under the Offer of Purchase. Because the unambiguous language of the contract alone does not resolve that question, it initially appears inappropriate to grant either side summary judgment with respect to the late execution shares. *Seiden*, 959 F.2d at 428.

However, if only one of the parties is capable of advancing a reasonable interpretation of Section 1, or if there is no extrinsic evidence of the parties' actual intent, then summary judgment would be appropriate. Because, as I now explain, there is both more than one reasonable interpretation of Section 1 and relevant extrinsic evidence, summary judgment for either party is inappropriate.

### B. *Reasonable Interpretation of Section 1*

#### 1. Plaintiffs' View

Plaintiffs argue that the proper interpretation of Section 1, with respect to Method 3, is achieved by replacing the term "Expiration Date" in Section 5 by "Proration Date," taken from Section 1. In other words, shares are validly tendered on the proration date if, on or before the proration date, the shareholder has taken the steps that were required to be taken on or before the expiration date in order to comply with the Offer of Purchase more generally. This interpretation is supported by several considerations.

First, the words of Section 1 refer to valid tender under the terms of the Offer; it is therefore reasonable to turn to Section 5. As mentioned above, a literal application of Section 5 yields a result different from that urged by plaintiffs; it requires that shares be deposited with Bankers Trust on or before the proration date. However, it is reasonable to assume that Method 3 was intended to facilitate tenders by the proration date by relaxing the re-

quirement of delivery to Bankers Trust and inserting certain other requirements in its place. Thus, the implication of the literal interpretation that delivery of shares to Bankers Trust must be made by the proration date under Method 3 is reasonably ignored as an unintended consequence of poor draftsmanship, which no one seriously interpreting the contract would consider. The result is that conditions (i) and (ii) are left. That is plaintiffs' view, although the reasoning stated above is not made explicit by plaintiff.

Second, plaintiffs argue that the description of Method 3 in Section 5 *begins* with the requirement that shareholders deposit shares and letters of transmittal at an eligible institution, and only *subsequently* states the requirement that a guarantee be sent to the Depositary by the eligible institution. From this, plaintiffs infer that a valid tender requires that the guarantee be sent after the shares and letters of transmittal have been delivered to the eligible institution.

Third, plaintiffs assert that Method 3 was intended for those shareholders who were easily able to deliver their shares to an eligible institution, but were not easily able to do so to the Depositary, and that Method 2 was intended for those who were not even able to deposit their shares easily at an eligible institution.

Fourth, language on the letter of transmittal and language in a tombstone advertisement are used to support the claim that a completed letter of transmittal was necessary for a tender. *See* Report at 13. This language is also used to support the claim that a completed letter of transmittal was necessary for a binding contract between the tenderer and the offeror.

### 2. Defendant's View

Defendant argues that Section 1 of the tender offer required *acceptance* of the offer by the proration date, and completion of the tender within the time frame specified in Section 5. It then argues that a shareholder could accept under Method 3 by having an eligible institution—acting as his or her agent—telex a guarantee to Bankers Trust in conformity with Method 3.

The argument that Section 1 requires acceptance—and not a fully effected tender—relies upon the following reasoning: it is clear that Section 1 was *not* intended to require *delivery of shares to Bankers Trust* by the proration date, yet delivery of shares is essential to a *fully* effected tender. Thus, the argument continues, Section 1 could not have been intended to require fully effected tenders by the proration date (tender is something that can be fully effected after the proration date). Therefore, according to defendant, the proration date was not a deadline for tender; it was a deadline for *acceptance* of the tender offer.

Because the Second Circuit took this view in *Pryor I*, 794 F.2d at 54 ("to fall within the proration period ... a shareholder had to accept the tender offer by Friday December 4 ..."), and because it is entirely consistent with plaintiffs' position and not disputed by plaintiffs, I focus on subsequent steps of defendant's argument. Defendant's next step is to argue that the guarantee from an eligible institution constituted acceptance. Its argument is fourfold.

First—and this is more implicit than explicit in defendant's view—it is clear that the guarantee telex is a communication *to* the Offeror's agent (Bankers Trust), while the delivery of the shares and the letter of transmittal to the eligible institution is something of which neither the Offeror nor its agent are made directly aware. Thus, in attempting to infer which aspects of Method 3 were intended to count as the *acceptance* for proration purposes, it is natural to suppose that the guarantee telex was supposed to constitute the acceptance, and the other acts were not.

Second, defendant asserts that its interpretation is most consistent with the design of the Offer of Purchase, because the inclusion of Method 3 in the Offer of Purchase was intended to permit shareholders who could not deliver their shares by the proration date and who could not execute a letter of transmittal by the proration date

to nevertheless subscribe to the offer by means of a guarantee telex. Defendant suggests that the three methods in Section 5 of the Offer of Purchase provide increasingly flexible methods for subscribers, whereas plaintiffs suggest that Method 2 and Method 3 are flexible in different ways, and that Method 3 is less flexible than Method 2 in that it requires delivery of shares to the eligible institution by the Expiration Date.

Third, defendant argues that the industry custom is to treat a guarantee telex as an acceptance, without requiring that the institution sending the guarantee telex have received the shares or the letter of transmittal before it sends the guarantee.

Fourth, defendant claims that US Steel and the parties responsible for administering the tender offer intended and believed that under the Offer of Purchase, a guaranty telex by the proration date was sufficient, and a letter of transmittal and shares to the eligible institution was unnecessary.

Defendant also responds to plaintiffs' argument that the letter of transmittal was required for a binding contract. Its response is essentially that what is required for a binding contract and what is required for an acceptance of the offer meriting *pro rata* treatment are not necessarily the same.

### 3. Comparison of the Parties' Arguments

Both plaintiffs' view and defendant's view are reasonable. As discussed above, adhering strictly to the plain language of the Offer of Purchase would render an interpretation that is manifestly unacceptable in this context, and not advocated by any of the parties. The Offer of Purchase contains no conclusive evidence of how the criteria for *acceptance* (as opposed to fully effected tender) are to be gleaned from Method 3 of Section 5. Although plaintiffs are not unreasonable to read in Section 5 a requirement that shares and a letter of transmittal be delivered to the eligible institution before the guarantee be sent, and to infer from that requirement that delivery is a prerequisite to acceptance, defendant is equally reasonable to read Method 3 as containing a method of acceptance categor-

ically more flexible than Method 2, and saying that while, for purposes of delivery, the letter of transmittal and shares must go to the eligible institution, for purposes of acceptance, a guarantee will be enough.

Although each of the parties has presented supplementary arguments on behalf of their respective interpretations (as indicated above), each has also responded to the other's arguments with sufficient force to leave it an open question—absent extrinsic evidence—as to which interpretation is superior.

### C. *Relevant Extrinsic Evidence*

Both sides to this dispute have submitted relevant extrinsic and parole evidence in support of their respective views. Plaintiffs argue that, if extrinsic evidence is accepted, the tender offer should be construed in light of the context in which that offer was made—a battle of tender offers between Mobil and US Steel for Marathon Oil. They argue that US Steel intentionally structured the Offer of Purchase so that shareholders who wanted to get their proration premiums would have to commit their shares, and thereby render themselves unable to protect shares with Mobil. Consideration of this entire theory requires extrinsic evidence. Other extrinsic evidence offered by plaintiffs is the testimony of US Steel employee Donald Frobey, that a letter of transmittal was required by the proration date. (Dep. of Frobey at 81).

Defendant offers extrinsic evidence and parole evidence (with respect to the late execution shares) in two areas. First, it offers evidence that US Steel did, at the time of issuing the Offer of Purchase, understand the Offer of Purchase as permitting *pro rata* treatment for "late execution shares." (Dep. of Hansen at 108–09; Aff. of Fiorino at ¶ 22; Aff. of Van De Giesen at ¶ 7). Second, it offers evidence that it was the custom in the industry to accept shares for *pro rata* treatment as long as the guarantee is telexed, and regardless of the timeliness of execution of a letter of transmittal. (Aff. of Fiorino at ¶ 18; Aff. of Van De Giesen at ¶ 7).

### D. *Application*

■ "Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate." *Seiden*, 959 F.2d at 428. As discussed, the language of the Offer of Purchase is susceptible of different interpretations; I find each of those interpretations to be reasonable, and the parties have presented relevant extrinsic evidence of US Steel' intent. I also note that, because the strictly literal view is inapplicable (under the strictly literal view, actual delivery of shares to Bankers Trust by the proration date would be required, but both sides reject this possibility; *see supra*), and because there are conflicting, reasonable interpretations about the function of Method 3 in the design of the Offer of Purchase as a whole, the Offer is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." For all of these reasons, I conclude that the language of the Offer of Purchase is susceptible to different interpretations with respect to whether late execution shares qualify for *pro rata* treatment, and which interpretation is correct is an issue of fact rendering summary judgment inappropriate. Both parties' motions for partial summary judgment with respect to the late execution shares are denied.

### III. The DTC Shares

The second area of dispute on these motions concerns shares that would be viewed as timely delivered to Bankers Trust by the Depositary Trust Company,[1] if the "book-entry" method were applicable, even though the certificates of those shares were not physically delivered to meet the deadlines of the Offer of Purchase. Plaintiffs argue that those shares did not qualify for *pro rata* treatment because timely *physical* delivery of the certificates was required by the clear and unambiguous language of the Offer of Purchase. Defendant argues that, because the Uniform Commercial Code in force in 1981 stated that book-entry delivery was the equivalent of physical delivery, the Offer of Purchase must be understood to permit book-entry delivery. In addition, defendant argues that custom and practice in the industry is to accept book-entry delivery as a full

---

1. I assume, for purposes of evaluating plaintiffs' motion for summary judgment on these shares, that defendant's contention that the shares were timely delivered under the book entry method is true. Plaintiffs are mistaken, as a matter of law, when they assert that it is defendant's burden to establish that these shares were timely delivered. Plaintiffs' cause of action essentially states that defendant paid out a smaller percentage of the premiums to plaintiffs than that to which they were entitled. Absent any specific authority holding otherwise, it is plaintiffs' burden to prove the percentage than that to which they were entitled. This, in turn, involves proving that the number of shares that were timely tendered is less than the number of shares plaintiff counted as timely tendered. Because I recognize that a simple adoption of this distribution of evidentiary burden is arguably unfairly onerous for plaintiffs, I am not ruling conclusively on this evidentiary matter here. However, in light of the outline of the evidentiary burden sketched above, I will not hold on *plaintiffs'* motion for summary judgment, that even if defendant is correct that book-entry method was acceptable, defendant will suffer summary judgment against it if it fails to provide evidence that the book-entry shares were timely delivered.

In any case, under 28 U.S.C. § 636, it is within the district court's discretion to permit the record to be expanded in a *de novo* review of a summary judgment motion. Plaintiffs' suggestion that the old age of this case counsels against enlarging the record is unpersuasive, given the evidentiary concerns above, given that plaintiffs are incorrect in characterizing defendants' book-entry argument as an affirmative defense, and given the late stage of this litigation at which the "book-entry" issue was raised. More importantly, the fact that this case has lingered as long as it has, combined with the magnitude of interests on each side of this litigation, certainly counsels strongly in favor of the court's exercising its discretion to permit potentially critical evidence to be submitted. Hence, even if, *arguendo*, defendant was required to submit evidence on the timeliness of the book-entry shares, defendant is entitled to do so, and has done so.

equivalent to physical delivery. Both parties move for partial summary judgment with respect to these shares.

The contract principles articulated in *Seiden* and discussed above apply to this issue as well. In addition, adjudication of this portion of the motions for summary judgment requires consideration of the principle that the law is part of every contract. *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980); *Dolman v. U.S. Trust Co.,* 2 N.Y.2d 110, 116, 157 N.Y.S.2d 537, 138 N.E.2d 784 (1956) (unless a contract provides otherwise, the law in force ... becomes as much a part of the agreement as though it were expressed or referred to therein ... and the contract will be construed in the light of such law). *See also* N.Y.C.C.C. Law § 1–205(4); N.Y.U.C.C. § 1–205(5) (McKinney's 1962 & Supp.1992) (where reasonable, the express terms of an agreement and an applicable usage of trade shall be construed consistently with each other). However, when a specific agreement has been negotiated between the parties and is stated explicitly in the contract, the agreement controls. *Jon–T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412 (5th Cir.1983); UCC § 1.192(3) ("the effect of provisions of the Act may be varied by agreement"). Finally, as Magistrate Judge Bernikow noted, industry practice cannot be viewed as evidence capable of changing the clear terms of a contract, *Croce v. Kurnit,* 737 F.2d 229, 238 (2d Cir.1984).

### A. *The Offer of Purchase, Excluding Extrinsic Evidence*

As noted above, the law is part of every contract. The Uniform Commercial Code provides that delivery of a security to a purchaser occurs when "... (e) appropriate entries on the books of a clearing corporation are made under Section 8–320." U.C.C. § 8–313(1) (as applicable in New York, prior to 1982 amendment). Moreover, under U.C.C. § 8–320(3), book-entry delivery "has the effect of a delivery of a security in bearer form or duly indorsed in blank (Section 8–313)." Combining the *Filner* holding with these provisions of the UCC, the Offer of Purchase should be treated as if it explicitly contained a clause permitting book-entry delivery, so long as the Offer of Purchase contains neither an explicit agreement that some provision of the UCC does not apply, nor an explicit agreement varying the terms that are otherwise "read in" to every agreement by the law. *Jon–T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412 (5th Cir.1983); UCC § 1.192(3) ("the effect of provisions of the Act may be varied by agreement").

Plaintiffs contend that the Offer of Purchase contains an explicit, specific agreement that varies the terms of Uniform Commercial Code § 8–320, which would otherwise be read into the contract. In the portion of Section 5 pertaining to tender Method 1, the Offer of Purchase explicitly requires that "certificates for such Shares," along with certain other documents, "must be received" by the Depositary at one of two addresses. In the portion of Section 5 pertaining to tender Method 2, it requires that "the certificates representing all Shares tendered by such Letters of Transmittal or facsimiles and any other documents required ... must be received by the Depositary...." In the portion of Section 5 pertaining to tender Method 3, it requires that "(iii) such Letter of Transmittal or facsimile, together with certificates for all tendered Shares and any other required documents, are received by the Depositary...." Plaintiffs argue that because of the use of the term "certificate," and the phrase "received by the Depositary," the Offer of Purchase contains an explicit, specific agreement that the UCC's provision permitting book-entry delivery does not apply, and that only physical delivery of the certificates is acceptable. The Offer of Purchase does not, however, state explicitly that "only physical delivery of the certificates" will suffice for delivery, or that "book-entry delivery" is not acceptable, or that the provisions of the UCC governing the permissibility of book-entry shares do not apply.

Plaintiffs' argument rests on two premises: first, that the use of the term "certificate" is inconsistent with the notion that

book-entry delivery of shares can satisfy the *explicit delivery* requirement of the Offer of Purchase, and second, that inclusion of a clause requiring *delivery* of certificates constitutes a specific agreement negating the UCC provision that would permit an alternative method.

### 1. "Certificate"

It is not unreasonable to interpret the word "certificate" in the phrase "certificate[s] of share" so that it applies only to physical documents. *Webster's Third New International Dictionary* (3rd Ed. 1976) at 367 ("3: a document evidencing ownership or debt").

Defendant suggests, however, that "certificates of share" could be interpreted broadly to refer to the shares as intangible interests, and that in this case, a book-entry transfer to the Depositary could constitute a delivery of certificates. I note that, as a general matter, the term "certificate" may be used in this broader sense. *Webster's Third New International Dictionary* (3rd Ed. 1976) at 367 ("2: something resembling or serving the same end as a certificate"). I hesitate to say that such a broad interpretation would be reasonable in a context such as the present one, in which the text refers to certificates "of shares" or "for shares." Defendants cite further authority allegedly supporting their view that "certificate" may be used in this *functional* sense, even in the case of share certificates. *See In re Domestic Fuel Corp.,* 70 B.R. 455, 462 (Bankr. S.D.N.Y.1987) (share certificates are merely written instruments evidencing of stockholder's interests); U.C.C. § 8–102(1)(c) ("[w]hen a security is certificated, the terms 'security' and 'certificated security' may mean either the intangible interest, the instrument representing the interest, or both").

Defendant's authorities on this point are weak and not directly on point. Recognizing that, in law, the search for ambiguity is not intended as an exercise of the imagination, I am skeptical of the reasonableness

of defendants' interpretation of "certificate." Because I do not need to rule on this issue, for the reasons discussed below, I will not do so. However, I will assume *arguendo* that plaintiffs are correct on this issue, and that under no reasonable interpretation does book-entry delivery qualify as delivery of "certificates" of shares. I turn to the assessment of plaintiffs' second premise—that inclusion of a clause requiring delivery of certificates constitutes a specific agreement negating the UCC provision that would permit the alternative (book-entry) method.

### 2. Specific Agreement

Defendant's argument on this point is forceful. Its position is that, under the law, the alternate methods must be explicitly ruled out in the Offer of Purchase. It is reasonable to interpret the Offer of Purchase as simply remaining silent on the acceptability of alternate methods, given that there is, in fact, no explicit mention of alternate methods and no reference to other methods at all. The certificate clause could be deemed to have as its main point the requirement that shares be delivered by a particular time, and to a particular institution. To put the point more vividly, if the contract contained an explicit provision stating what the UCC states—delivery of shares by book-entry shall be equivalent to delivery of certificates—a reasonable interpretation would exist according to which the contract was *internally consistent.* The UCC clause would be deemed to *qualify* the "certificate" clause, not to *contradict* it.[2] Accordingly, given that the law is part of every contract, the Offer of Purchase could be interpreted as if it contained the UCC clause, and the "certificate" clause did not contradict it. On that view, the certificate clause would not constitute a specific agreement negating the UCC provision that would permit an alternative method. Because this is a reasonable interpretation without referring to extrinsic evidence, unless plaintiffs have extrinsic evidence rendering this interpretation such

---

**2.** By contrast, if the "Certificate" clause had read "the only acceptable method of delivery is physical delivery of the certificates" and had

explicitly contained, in addition a UCC clause stating that book-entry would also suffice, those two clauses would be mutually inconsistent.

that no reasonable fact-finder could accept it, plaintiffs' motion for summary judgment on the DTC shares should be denied.

The next question is whether there is a reasonable interpretation according to which the certificate clause constitutes a specific agreement negating the UCC provision that would permit an alternative method. Without considering extrinsic evidence, I conclude that there is such an interpretation. The passages in Section 5 requiring delivery of the certificate contemplate delivery of a number of other documents as well. It is not unreasonable—absent extrinsic evidence—to interpret the Offeror as envisioning that physical delivery was irreplaceable in the structure of the offer. Similarly, it is not unreasonable—absent extrinsic evidence—to suppose that when the drafter of the offer specified "certificates," they believed that this specification succeeded in foreclosing alternatives.

For the reasons stated above, I find that reasonable persons could differ on the question of whether, in light of the certificate clauses, the provisions of the UCC permitting book-entry shares are rendered inapplicable by the language used in the Offer of Purchase.

### B. *Extrinsic Evidence*
#### 1. Defendant's Evidence

Defendant offers extrinsic evidence principally on two points: (1) the intent of US Steel, and (2) the custom or practice of the industry. With regard to the intent of US Steel, Defendant points out that it entered into an agreement with DTC for processing shares in the tender offer, through the book-entry method, and pursuant to the Voluntary Offering Program. (App. at A0467). This agreement was entered into on November 20, 1981, one day after the initial tender offer and several days before the extension of the tender offer. This arguably provides evidence that US Steel did not intend the certificate clauses to remove the implicit UCC provisions accepting book-entry as equivalent to physical delivery. *But see* Report at 26 ("US Steel was unaware of DTC").

Second, defendant provides evidence of eighty tender offers in 1981 that used the Voluntary Offering Program and the book-entry method of delivery. (Aff. of Scholl at ¶ 24). Defendant also offers evidence that, in the seventy-one of these tender offers for which defendant's counsel were able to procure copies of the offers of purchase, there was no reference to book-entry transfer or the Depositary Trust Company or the Voluntary Offering Program. (Aff. of Sabella at ¶¶ 3–4). More generally, defendant offers evidence that portrays the history and status of the book-entry method in 1981, and the role of the Voluntary Offering Program (Aff. of Scholl), and thereby attempts to explain why the Offer of Purchase should be viewed as merely silent on the issue of book-entry delivery.

The evidence proffered by defendant, although not necessarily conclusive, provides significant evidence that the certificate clauses of the contract were not intended to negate the permissibility of the book-entry method, under the UCC. I therefore find that plaintiffs' motion for summary judgment with respect to the DTC shares should be denied.

#### 2. Plaintiffs' Evidence

Plaintiffs contest defendant's assertions of fact, and also the relevance of those assertions. For example, they offer evidence that US Steel's counsel was unaware of the Depositary Trust Company. (Dep. of Hansen at 33); (Dep. of Hays at 75–76); (Dep. of Stenton at 92–93). They also offer evidence suggesting that the relevant customs of the industry are not as pervasive as defendant suggests. (Aff. of Dreizen). This evidence is also relevant to the question of whether the certificates clauses was intended to rule out the possibility of book-entry delivery. Summary judgment for defendant on the DTC shares is therefore denied.

### CONCLUSION

For the reasons stated above, both parties' motions for partial summary judgment are denied. The joint pre-trial order shall be submitted on or before December 7,

1992. The case shall be ready for trial on December 8, 1992. Counsel are directed to review this Court's Individual Rules regarding procedures to follow to inform the Court in advance of any commitments that conflict with trial readiness on or after December 8, 1992. Defendant's motion to bifurcate the damages and liability phases of trial is granted.

SO ORDERED.